ESTATE OF JOHN B. SHARPE, THE UNION TRUST COMPANY OF PITTS-BURGH, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 112179.    Promulgated April 14, 1944.

*John Lloyd, Jr., Esq.*, for the petitioner.
*Paul A. Waring, Esq.*, for the respondent.

614

OPINION.

MELLOTT, *Judge*: The provisions of the revenue act and of the regulations applicable to the first issue are shown in the margin.[4]

---

[4] Section 303 (a) (3), Revenue Act of 1926, as amended by section 807, Revenue Act of 1932 and section 406 Revenue Act of 1934—

SEC. 303. For the purpose of the tax the value of the net estate shall be determined—

(a) In the case of a citizen or resident of the United States, by deducting from the value of the gross estate—

*     *     *     *     *     *     *

(3) The amount of all bequests, legacies, devices, or transfers. * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scien-

Petitioner, pointing out that the statute recognizes a transfer may be made either to a corporation meeting the specified tests or to a trustee meeting somewhat the same but neverthless different tests, divides its argument into two parts. Its major contention, or in any event the one discussed at greater length upon brief, is that the decedent, in effect, created two successive trusteeships—one (Union Trust Co.) being "an investing trustee" and the other (the committee) being "a spending trustee." In this view it contends it is entitled to the claimed deduction, regardless of what might be the nature of the activities of the United Committee. It argues, however, that the evidence establishes the corporation named as beneficiary of the trust possesses all of the characteristics specified in the first subdivision of the statute and that the deduction should be allowed even if its theory that the committee was a mere spending trustee be found to be untenable.

Respondent insists that his determination should be upheld. He argues that the evidence conclusively shows the committee was not organized and operated exclusively for charitable or educational purposes and that a substantial part of its activities consisted of carrying on propaganda or otherwise attempting to influence legislation; that it was the beneficiary of the gift made by decedent and could expend the funds in any way it saw fit; that its purpose was "to assist in all proper ways to establish * * * [the principles espoused by Henry George] in practical operation of law;" that some of the ways determined by it to be proper included propaganda, attempts to influence legislation, and the carrying on of political activities in an effort "to effect a change in the existing tax system"; and that the gift was clearly outside of the purview and intent of the statute.

The parties base a substantial part of their argument upon evidence of doubtful pertinency or value—reports of the committee for the years 1935 and 1936. Respondent quotes at length from one of them to

---

tific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, or to a trustee or trustees, or a fraternal society, order, or association operating under the lodge system, but only if such contributions or gifts are to be used by such trustee or trustees, or by such fraternal society, order, or association, exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals

Article 45, Regulations 80—

Art. 45. *Religious, charitable, scientific, and educational corporations.*—A corporation or association to which such a transfer was made must meet four tests: (1) It must be organized and operated for one or more of the specified purposes; (2) it must be organized and operated exclusively for such purpose or purposes; (3) no part of its net earnings shall inure to the benefit of private stockholders or individuals; and (4) no substantial part of its activities shall be carrying on propaganda, or otherwise attempting, to influence legislation.

*      *      *      *      *      *      *

show that the committee, by its own statement, had been enabled to carry out "with the revenue from donations and contributions to the Land & Liberty [magazine published by the committee] Sustentation Fund * * * the special propaganda, notably on the municipal campaign and the General Election, as explained in this report." Petitioner points out that the same report shows it has carried on its work "as a purely non-party educational association, making opinion as it can through the financial means placed at its disposition by voluntary contribution"; that it has been appointed as trustee of the "Henry George Foundation of Great Britain" and as such has, as required by the deed of trust of a named contributor (not this decedent), complied with the provisions requiring that the fund "be used only for the publication, advertizing and circulating of the works of Henry George and kindred literature offered for sale and not * * * for subsidizing any other form of work"; and that the funds of the foundation "are kept entirely distinct from those of the United Committee." This, it insists, supports its contention it was merely "a spending trustee," supervising and administering the charitable trust, represented by the funds being and to be turned over to it by the "investing trustee." Respondent also points out that at least in 1935 and 1936 substantial amounts, as shown in our findings, were expended by the committee for "general propaganda" and in connection with "municipal campaign" and "general election."

In our judgment the statements contained in the reports, even though brought onto the record by the stipulation of the parties, can not be made the basis of decision in the instant case. Even if we ignore the hearsay feature, the action of the committee in years prior to the transfer by the decedent is not determinative of the use to which the funds contributed by the decedent will be put. Nor can we find anything in the present record which would justify us in concluding that the settlor intended that the gift, when received by the committee, would be held by it in trust for the foundation referred to in the reports or for any other limited use. In reaching this conclusion we have not failed to take into consideration the well established principles applicable to charitable trusts, as carefully and, on the whole, accurately set out in petitioner's brief. Briefly they are—whether tested by the laws of New Jersey, decedent's domicile, by the laws of Pennsylvania, where the trust was accepted,[5] or by the laws of England, where the committee has it principal office and conducts its activities—that charitable trusts are favored by the law and by the courts, will not be permitted to fail for want of a trustee, will be construed to effectuate the will of the

---

[5] The trust instrument recites the trust has been accepted in Pennsylvania "and all questions pertaining to the validity and construction of this indenture shall be determined in accordance with the laws of the commonwealth of Pennsylvania."

settlor no matter how ineptly expressed, and will be enforced by the courts in an action prosecuted by the proper officer in the name of the sovereign. To these may be added, as suggested by petitioner, it is not necessary for the creation of a charitable trust that the donee be specifically described as a trustee or that the gift be specifically characterized a trust, if from the whole instrument it clearly appears that a charitable trust was intended to be created, and the trustee may be either a private person or a corporation.

Most of the cases cited by petitioner from the three jurisdictions merely exemplify one or more of the general principles briefly alluded to. The differences, if any, in the law of the three jurisdictions seem to be so few and insignificant that we need not pause to determine which is applicable. On this phase of the case it should be kept in mind that we are not now considering the question presented to the courts in most of the cases cited by petitioner. Thus, in *George* v. *Braddock*, 45 N. J. Eq. 757; 18 Atl. 881, it was perfectly clear from the language of the will that the property had been bequeathed in trust—"in sacred trust," said the proviso—for the express purpose of "spreading the light" on social and political liberty as taught by Henry George. The vice-chancellor held that the trust should not be enforced as a charitable trust because the doctrine was "antagonistic to the purpose" for which courts had been created. The Court of Errors and Appeals characterized the holding as one declaring that a court will not lend its aid "to the agitation of the question whether the laws which it is in the habit of executing have or have not any better foundation than wrong and injustice." It held the true test to be whether the writings to be circulated, "when considered with respect to their purpose and general tendency, [were] hostile to religion, to law, or to morals" and, applying that test, upheld the trust as a valid charitable one.

In *In re Mears Estate*, 299 Pa. 217; 149 Atl. 157, a bequest had been made to Harvard University to be used in teaching eugenics. Harvard refused to accept the bequest and the question presented to the Supreme Court was whether its declination effected a nullification of the wishes of the testator and ended the trust. Pointing out that the settlor had been "definite as to the means by which his charitable purposes may be carried out, and equally plain as to the objects of the charity," the court applied the principle that "if one trust agency fails the courts will supply another."

The cases and others cited by petitioner would be more nearly apposite if the issue were whether a valid trust had been created by the settlor; but no such question is being raised. The trustee has accepted the trust and, for aught that appears in this record, is enforcing it according to its terms. Petitioner's argument that two

separate trusts were established, the nominal beneficiary being a trustee, seems to be based very largely upon the following quotation from Restatement of the Law of Trusts (p. 1101):

If * * * the transferor manifested an intention to restrict the transferee in the use of the property transferred, the transfree does not take the property for his own benefit. A charitable trust is created if the transferee was restricted in the use of the property to charitable purposes.

The rule may be accepted as sound; but it does not justify the conclusion sought by petitioner. The remainder of the paragraph of comment, in which the quoted portion appears, recognizes the rule that, if a transferee is restricted in the use of the property to purposes not limited to charitable purposes but including noncharitable purposes for which a trust can not validly be created, the transferee holds the property upon a resulting trust for the transferor or his estate. Moreover, the rule upon which petitioner relies requires a "manifestation of intention," which the same treatise says "means the external expression of intention as distinguished from undisclosed intention." *Knight* v. *Knight*, 3 Beav. 148, from which petitioner quotes at length, furnishes but slight support for his contention; for it lays down the tripartite requirement that the donor's words of limitation be imperative, the subject of his gift certain, and "the objects or persons intended to have the benefit of the recommendation or wish be also certain." In our judgment no such showing has been made in the instant case. We are therefore of the opinion petitioner can not prevail upon the theory urged.

Since we have concluded that the transfer was made for the use of the committee rather than to be held by it as "a spending trustee," we must now determine whether the corporation meets the tests laid down by the statute and the regulations.

The purposes for which the committee was organized are shown by the memorandum and articles of association attached to the stipulation, pertinent excerpts from which are shown in our findings. Evidence as to its operation is quite meager, consisting in the main of published reports for 1935 and 1936 and copies of pamphlets published by it.[6] The dearth of evidence is attributed by petitioner, upon brief, to the difficulty of transporting witnesses because of present war conditions. Enough is shown, however, to enable us to get a reasonably clear view of the committee's activities.

The best evidence of whether the committee was organized and

[6] The Study of Political Economy by Henry George, being a reprint from the Popular Science Monthly, March 1880; The London County Council and the Rating of Site Values; September, October, November, and December 1938 issues of Land & Liberty, Monthly Journal for Land Value Taxation and Free Trade, including articles upon such subjects as "What is Labour's Agricultural Policy?" "Education's Toll to Landlordism," "Economic Background of the Crisis," "Social Justice the Way to Peace," "The Municipal Elections," "Condition of the English Peasantry," "Why Rents and Rates are High—New York," "Food Taxation and Landlord's Rents," "Town Planning and Taxation," "The London County Council Bill for Rating Site Values."

operated exclusively for charitable or educational purposes, as contended by petitioner, and whether any substantial part of its activities consisted of carrying on propaganda or otherwise attempting to influence legislation, may be found in its articles of incorporation. They show its objects to be, among others, "advocating and maintaining the principles" of the single tax, assisting "in all proper ways to establish the same in practical operation of law," giving "aid to individuals or other organizations with similar objects," and doing "all other acts that may tend to further the objects named." The income and property of the association, whencesoever derived, is to be "applied solely towards the promotion of the objects of the Association" as set forth in the memorandum.

The objects and purposes set out above, in our judgment, support the respondent's determination that the committee was not organized and operated exclusively for charitable or educational purposes. "To advocate the abolition of all taxes upon industry and the products of industry and their replacement by a single tax upon land," as the Circuit Court of Appeals for the Second Circuit pointed out in *Leubuscher* v. *Commissioner*, 54 Fed. (2d) 998, is not "an educational purpose, although it may be educational in some degree to those who listen to or read the theories urged. It has for its purposes the dissemination of controversial propaganda, which means a plan for the publication of a doctrine or system of principles." "A legislative program is outside the intendment of the statute, and, having it, a corporation cannot claim an exclusively educational or charitable purpose. *Slee* v. *Commissioner*, 42 Fed. (2d) 184." *Frederick C. Leubuscher, Executor*, 21 B. T. A. 1022, 1028. Cf. *Weyl* v. *Commissioner*, 48 Fed. (2d) 811. "To assist in all proper ways to establish the [principles] in practical operation of law" certainly connotes a legislative program; but any doubt that this is true seems to be dispelled completely by the broader language "to do all other acts that may tend to further the objects named." Moreover, the copies of the monthly journal "Land & Liberty," published by the committee and attached to the stipulation, indicate that a substantial part of the activities of the committee was "carrying on propaganda or otherwise attempting to influence legislation." A few illustrations will suffice. Thus in the September 1938 issue a communication of the assistant editor to "The Times" is printed, in which it is said:

The London County Council is entitled to expect that its proposal for a rate on site values in London will be considered by Parliament on its merits, and Mr. Herbert Morrison's Bank Holiday speech was no more than a perfectly proper plea that this should be so. Sir Harold Webbe's letter to you confirms the impression that an attempt will be made to avoid that consideration by raising the side issue that such legislation should apply to the whole country and should not be introduced by private legislation. If the proposal is a beneficial one, the onus rests upon its opponents of demonstrating why it

should not be applied to London whether or not the rest of the country enjoys its advantages and no one has yet attempted that task.

In the same issue, under the heading "Education's Toll to Landlordism," it is said:

Arising out of a question in the House of Commons, 27th July, 1938, the Rt. Hon. Col. Josiah C. Wedgwood has been supplied with particulars of 105 sites compulsorily acquired under authority of the Board during the years 1934, 1935, 1936, and 1937. Not all the prices can yet be stated as a number await approval. Eliminating these and also cases where acquisition included buildings, we have compiled the following table: [Then follows a table listing 290 acres stated to be "agricultural land or vacant land which despite its value was exempt from contributions to local taxation—landowners received the gift out of the public purse of not less than £212,477."]

In "News of the Movement," in the September 1938 issue—a subdivision or title appearing in each journal—is a suggestion that contributions be made for the purpose of reprinting some of the pages of the August issue:

* * * as a pamphlet and thus give the widest possible publicity to the action of the London County Council and its importance for everyone interested in permitting the rating of land values. That is what should be sent far and wide to councillors and others. The inclusive cost of such an enterprise along with necessary circulars and postage would be in the neighborhood of £100. The opportunity is so inviting and the occasion so vital that we have no hesitation in appealing to our supporters for special donations that will be earmarked for this purpose.

In the October 1938 issue, in a signed editorial by the assistant editor, it is said:

What is most needed to secure the peace of the world is throwing down of all barriers between nations which prevent the free movement of goods and all people, together with the abolition of the barriers which prevent the denizens of each country from making use of its national resources and which require them to make payment to a few among them for this essential and national right. If such conditions were established, every man would be in effect a citizen of the world with liberty to produce wealth wherever opportunity offered and freedom to transport himself and his possessions where he chose.

A statement of the leader of the London County Council for Site Value Rating is set out, in which it is said:

The general body of ratepayers have every interest in the Councillors' proposal and they should write to their Members of Parliament asking them to support the bill. Those Members of Parliament who oppose this bill are thereby insisting that the occupiers shall continue to carry the full burden in order that the owner of the land shall escape.

Under the heading "Wanted—More and More Publicity," it is stated:

By arrangement (Land & Liberty offices) "The Bradford Citizen" is getting an article every month. A syndicated article by F. C. R. Douglas [assistant editor of the Journal] issued some months past and published widely came to light again in "The Rotherham Express" on 17th September—indicating how

editors have material on file ready to be used when a question comes to the front \* \* \*. Turning again to special articles, "The Labour Press" service of 7th September, produced the facts and figures (Land & Liberty has given them) of "Expensive Playgrounds—or None at all", how land speculation hinders the "Keep Fit" campaign.

In "News of the Movement," in the October issue, speakers are urged to secure the handbook printed by the committee, and it is said:

Leaflet literature for the municipal elections will be immediately in demand and we ask our supporters to help us in meeting it. Two of the leaflets (octavo size) most in request are "Tax Land Values" and "Who Should Pay."

In a 222-page Handbook for Speakers and Writers published by the committee and bearing the title "Why Rents and Rates Are High—Land Monopoly in Town and Country—600 Examples," forewords by members of Parliament appear in which is is said:

In this book the author sets out with great clarity the facts of the land ramp. He shows how in instance after instance the values created by the community are taken by individuals who have done no service whatever. It is easy to condemn the people who make extravagant profit by holding the owner to ransom but the real condemnation should be on the people of this country who allow exploitation to go on. I hope that this book will be widely read and that the striking examples will be brought before the electors. \* \* \* To obtain the driving force necessary to remedy this injustice it is essential that the facts should be brought home to the electorate.

In the subdivision "News of the Movement" in the November 1938 issue it is said:

The English provincial papers \* \* \* are much more willing to give publicity to our views than are the "national" papers. It is already known that many of the 340 papers, to which the general secretary had sent a letter on the Borough Elections, have printed it and applications are being received from readers who wish for further information. Thanks are due and are hereby tendered to members who sent to the office lists of candidates for their Borough Councils. All candidates whose names and addresses were obtained, in this or other ways, have been communicated with.

Petitioner insists that *Slee* v. *Commissioner*, 42 Fed. (2d) 184; *Leubuscher* v. *Commissioner*, 54 Fed. (2d) 998; *Cochran* v. *Commissioner*, 78 Fed. (2d) 176; and *Girard Trust Co.* v. *Commissioner*, 122 Fed. (2d) 108, directly or impliedly hold that the political activity inhibited by the phrase "carrying on propaganda or otherwise attempting to influence legislation" is "that kind of political effort which is *directly* aimed at procuring the enactment or repeal of specific laws." We do not so construe the cases. In the *Slee* case the only activities touching upon legislation consisted "in directing persons how best to prepare proposals for changes in the law and in distributing leaflets to legislators and others recommending such changes \* \* \*." In the *Leubuscher* case, as pointed out above, the advocacy of the single tax was held not to be exclusively educa-

tional; but a corporation to be formed only for the purpose of teaching and propounding the ideas of Henry George and not for seeking the passage of legislation met the test. In the *Cochran* case the court was of the opinion that the evidentiary findings of the Board of Tax Appeals did not support its conclusion that the World League Against Alcoholism was organized for legislative purposes. The *Girard Trust Co.* case possibly comes closer to suggesting the rule urged upon us by petitioner. In that case the court reversed our holding in *Estate of Ida Simpson*, 41 B. T. A. 157, that the Board of Temperance, Prohibition and Public Morals of the Methodist Episcopal Church was not engaged exclusively in religious, charitable, or educational purposes because it advocated the enactment of laws to suppress the liquor traffic, extensively carried on propaganda, and had for one of its objects "the speedy enactment of * * * legislation [to suppress the liquor traffic] throughout the world."

With all due deference to the court, we adhere to the views expressed by us in the *Simpson* case; but the point need not be pressed. The reasonable inference from the meager evidence before us is that the committee was, during the four months immediately following the death of the decedent, engaged in political activities directly aimed at procuring the enactment of the London County Council Bill for Site Value Rating; that it was backing the Parliamentary Labour Party in the promotion of "legislation * * * which would enable all local authorities to take rates off houses and industry and put them on site values"; and that it aided and intended to aid, both by its publications and through its officers, in making "the L. C. C.'s proposal a national issue."[7] Thus even under the rule urged by petitioner—which, however, we do not approve—it has been shown that the deduction may not be allowed.

The reference in the preceding paragraph to specific political activities is not to be construed as an intimation that they constituted all of the activities which we believe should be construed as "carrying on propaganda or otherwise attempting to influence legislation." The monthly journals of the committee, and particularly the excerpts set out above, indicate it was engaged in political agitation, that it was set up for that purpose, and that it did not limit its activities purely to education—teaching and expounding. Thus it can not be said that the corporation was organized and operated exclusively for charitable or educational purposes. Whether any substantial sums were expended in espousing or opposing the election of public officers is, on this record, difficult to determine. As stated above, we prefer not to accept the reports of 1935 and 1936 as proof that similar expenditures were made by the committee at about the time of the death of the decedent. The important circumstance is that the committee, under

---

[7] The quotations are from the September issue of Land & Liberty, p. 148.

its articles of association, was free to make such expenditures if it chose to do so. That, in our judgment, prevents the allowance of the claimed deduction under section 303 (a) (3), *supra*.

The remaining issue is whether the estimated present value of trustees' commissions, payable in substantially equal annual installments during the 25 years following the decedent's death, denominated "termination fee" or charges for paying out the trust property, may be taken into account in determining the amount of estate tax due. As shown in our findings, deduction was claimed in the estate tax return in the amount of $8,890.95, of which $542.35 has been allowed, this being the amount actually paid. Petitioner concedes that the amount claimed is not deductible under section 303 (a) (1) (B) of the Revenue Act of 1926 as amended, but claims that the amount in its hands for transfer to the committee "was inevitably diminished and the value of the transfer * * * was certainly, in fact, lessened" by the obligation to pay the termination fee. It therefore urges that there should be a reduction, apparently under section 303 (a) (1) (D) of the Revenue Act of 1926 as amended,[8] in the value of the property transferred to the trust. The applicable regulation is shown in the margin.[9]

In *Estate of George S. Fiske*, 45 B. T. A. 52; affirmed *sub nom. Commissioner* v. *Davis*, 132 Fed. (2d) 644, it was held that a termination charge, payable by the trustee of an *inter vivos* trust to itself as "compensation for services * * * in the conservation of the trust fund for the entire period of its existence up to the time of its transfer to the executors under the will [1903 to 1936]," was excludible from the value of the gross estate. Petitioner insists this case supports its claim that the value of the property in the trust at the date of the death of the decedent should be reduced by $8,379.12. We do not agree.

The same question was before us in *Central Hanover Bank & Trust*

---

[8] SEC. 303 [as amended by § 805 of the Revenue Act of 1932, 47 Stat. 169, 280]. For the purpose of the tax the value of the net estate shall be determined—

(a) In the case of a resident, by deducting from the value of the gross estate—

(1) Such amounts—

   (A) for funeral expenses,

   (B) for administration expenses,

   (C) for claims against the estate,

   (D) for unpaid mortgages upon, or any indebtedness in respect to, property where the value of decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate * * *

as are allowed by the laws of the jurisdiction * * * under which the estate is being administered * * *. [26 U. S. C. A., Int. Rev Acts, p. 232.]

[9] ART. 33 [Regulations 80 (1937 Ed.)]. *Executor's commissions.*—The *executor or administrator*, in filing the return, may deduct his commissions in such an amount as has actually been paid or which at that time it is reasonably expected will be paid, but no deduction may be taken if no commissions are to be collected. * * *

* * * * * *

Amounts paid as trustees' commissions do not constitute expenses of administration and are not deductible, whether received by the executor acting in the capacity of a trustee or by a separate trustee as such.

*Co., Executor,* 40 B. T. A. 1210. We held it was "too obvious for comment that such future commissions are not measurable by applying the statutory rates of percentage to the value of the property at the time of decedent's death, but only by applying such rates to the value of the property when distributed or paid out." Opinion was expressed that it was doubtful if any evidence could be produced by which the amount of future commissions could be determined. This was the view hinted by the Circuit Court of Appeals for the Second Circuit in *Farmers' Loan & Trust Co.* v. *Bowers,* 98 Fed. (2d) 794, and in *Adriance* v. *Higgins,* 113 Fed. (2d) 1013, and taken definitely in affirming our decision in the *Central Hanover Bank & Trust Co.* case. See *Central Hanover Bank & Trust Co.* v. *Commissioner,* 118 Fed. (2d) 270. The fundamental distinction between this line of cases and the *Fiske* case, *supra,* as well as *Estate of Frederic E. Baldwin,* 44 B. T. A. 900, upon which petitioner also relies, is that in the latter group the trustees' commissions were payable before the property was to be turned over to the estate, while in the other group and in the instant case the commissions will become due and payable, almost in their entirety, for services to be rendered after the death of the decedent.

The Commissioner, in our judgment, committed no error in determining the deficiency in tax.

*Decision will be entered for the respondent.*