THE HUNTINGTON NATIONAL BANK, OF COLUMBUS, OHIO, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

OTTERBEIN COLLEGE, TRANSFEREE OF THE ESTATE OF SHAUCK E. BARLOW, DECEASED, PETITIONÉR, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 17736, 17737.    Promulgated November 21, 1949.

*Roger K. Powell, Esq.*, for the petitioners.
*W. W. Kerr, Esq.*, for the respondent.

766

OPINION.

VAN FOSSAN, *Judge*: The first question to be considered is whether the payment of $25,000 made by the executor of decedent's estate to the estate of decedent's widow is an allowable deduction under the provisions of section 812 (b) (3) or (5) of the Internal Revenue Code.[1]

___

[1] SEC. 812. NET ESTATE.

For the purpose of the tax the value of the net estate shall be determined, in the case of a citizen or resident of the United States by deducting from the value of the gross estate—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(b) EXPENSES, LOSSES, INDEBTEDNESS, and TAXES.—Such amounts—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(3) for claims against the estate,

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(5) reasonably required and actually expended for the support during the settlement of the estate of those dependent upon the decedent,

as are allowed by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered &ast; &ast; &ast;.

Section 81.40 of Regulations 105 provides that the support of dependents of the decedent during the settlement of the estate is deductible pursuant to the following rules:

(a) In order to be deductible, the allowance must be authorized by the laws of the jurisdiction in which the estate is being administered, and not in excess of what is reasonably required.

(b) The allowance for which deduction may be made is limited to support during the settlement of the estate. Any allowance for a more extended period is not deductible.

(c) There must be an actual disbursement from the estate to the dependents, but after payment has been made the right of deduction is not affected by the fact that the dependents do not expend the entire amount for their support during the settlement of the estate.

The respondent relies in particular upon subparagraph (c) of the above section of Regulations 105, providing "There must be an actual disbursement from the estate to the dependents." He points out, among other things, that the decedent's widow was a woman of means in her own right, that she survived the decedent by only about eight months, and that the amount of $25,000 was not paid to the decedent's widow, but to the executrix of the widow's estate about a month after her death.

In *Estate of Peter D. Middlekauff*, 2 T. C. 203, wherein the amount of $7,500 was allowed as a deduction for the support of decedent's widow under section 812 (b) (5), it is stated that "The fact that the widow had income of her own and did not have to have the allowance made by the Probate Court is beside the question." In that case it was found that, pursuant to the order of the court made in the estate proceedings of the decedent, the executor made during the probate of the estate 10 monthly payments of $750 each to decedent's widow It was also found that the widow actually expended for her support and maintenance an amount in excess of $750 a month allowed and paid to her.

While the evidence herein shows that the amount of $25,000 was allowed for a year's support of the widow by the laws of the jurisdiction under which the estate was being administered (Page's Ohio General Code, Ann., secs. 10509–74 and 10509–75), there is no evidence from which the amount or the approximate amount actually expended for the support of the widow can be determined. The fact that the amount of $25,000 set off by the appraisers was approved by the probate court is only prima facie evidence of the reasonableness of the amount. *Roth* v. *Wardell*, 77 Fed. (2d) 124; *Mary A. Powers, Executrix*, 6 B. T. A. 633.

Section 812 (b) allows the deduction of the amount "reasonably required and actually expended for the support" of those dependent upon the decedent. The fact that the petitioner paid the amount after the widow's death to the executrix of her estate does not establish that

the amount was actually expended for the support of the widow. At the time the $25,000 was paid by decedent's executor, the widow had died and therefore no longer required support. The amount was deposited by the executrix of the widow's estate in the bank account of the estate and, together with other funds therein, was disbursed by the executrix in the administration and distribution of the estate.

The burden rests upon the taxpayer to show that the deduction claimed falls within the language of the statute. *Brown* v. *Helvering*, 291 U. S. 193; *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435. This, petitioner has failed to do. The disallowance of the deduction under section 812 (b) (5) is therefore approved.

Section 81.36 of Regulations 105 provides, in part, as follows:

* * * *Claims against the estate.*—The amounts that may be deducted under this heading are such only as represent personal obligations of the decedent existing at the time of his death, whether or not then matured * * *.

In *Neville* v. *Sawicki*, 67 N. E. (2d) 323, the Supreme Court of Ohio held that the widow's statutory right for 12 months' support is only an expectant interest, and stated that:

The right of a widow to receive support for twelve months after the husband's death is a right granted to a widow, not to a wife. In other words, that right does not come into existence until the death of the husband.

The amount of $25,000 is, therefore, not deductible as a claim against the estate. See *Estate of Nellie Grant Burbank Dodge*, 40 B. T. A. 209; *Estate of Louis M. Faber*, 40 B. T. A. 1070; *Estate of Daisy W. Jacobs*, 8 T. C. 1015.

The next question to be determined is whether the respondent erred in disallowing as a deduction from the value of the gross estate the value of the bequest and devise of decedent's residence to the Marion County Federation of Women's Clubs, located at Marion, Ohio. There is no dispute as to the amount of the deduction.

Section 812 (d) of the Internal Revenue Code permits the deduction of the amount of all bequests, devises, or transfers:

* * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation * * *.

The word "exclusively" has been liberally construed. *Estate of Robert Marshall*, 2 T. C. 1048, 1051; affd., 147 Fed. (2d) 75; certiorari denied, 325 U. S. 872.

The primary activities of the Federation were the promotion of interest in individual self-improvement and enlightenment by means of study groups covering a variety of topics and education generally.

It expended and contributed funds and services for charitable, educational, and social welfare purposes. Its social activities were merely incidental to its educational or charitable activities. The respondent has adduced no evidence to the contrary.

The carrying on of propaganda or otherwise attempting to influence legislation does not automatically disqualify the Federation under the statute. To disqualify it, such activities under the statute must constitute a "substantial part of" its activities. Such is not the case here. The fact that the Federation studies proposed legislation pertaining to the education and welfare of children and may have expressed its approval or disapproval thereof to its legislative representatives does not bar classification as an educational, literary, or charitable organization under the statute. *Slee* v. *Commissioner*, 42 Fed. (2d) 184; *Girard Trust Co.* v. *Commissioner*, 122 Fed. (2d) 108. There is no evidence that the Federation had any legislative program or disseminated controversial propaganda. Cf. *Estate of John B. Sharpe*, 3 T. C. 612, 621; affd., 148 Fed. (2d) 179, and *Estate of Robert Marshall*, *supra*. This activity was only a minor one and not a substantial part of its activities.

The case of *Robbins B. Stoeckel*, 2 T. C. 975, cited by the respondent, is distinguishable. It was held that the club therein involved was not organized exclusively for educational, literary, or charitable purposes within the purview of section 812 (d) because the facts failed to show that the social aspect of the club's organization was only incidental to a primary purpose of furthering higher education.

In our opinion, the Federation meets the requirements of section 812 (d). The Commissioner erred in disallowing as a deduction the value of the devise and bequest to the Federation.

Passing to the next issue, it is not disputed by the respondent that the estate is entitled under section 812 (d) to a deduction of the value of the bequest to Otterbein College, nor is there any dispute as to the value of the residue of the decedent's estate, in which his widow had a life estate. The controversy relates to the value of the life estate of the widow of decedent, which value must be deducted from the value of the residue to determine the value of the bequest to Otterbein College allowable as a deduction to the estate.

In computing the value of the widow's life estate, the respondent applied the factor of .84691 from the Combined Experience Table of Mortality, which factor reflects a life expectancy for the life tenant of slightly over four years, computed on the basis of compound interest of 4 per cent per year. Regulations 105, sec. 81.10 (i). This computation resulted in increasing the value of the widow's life estate and correspondingly reduced the deduction claimed by the estate for gifts to charitable, educational, etc., institutions.

The petitioners contend that, because of the physical condition of the widow at the date of her husband's death, she had a life expectancy of no more than one year, and that the factor .96154 should be applied to the value of the residue if the Combined Experience Table at 4 per cent is to be used. They contend, however, that, since the yield from the estate was less than 3½ per cent, the Combined Experience Table at 3½ per cent, or the factor .96618, should be used in determining the value of the life estate of the widow in the residue.

Thus, the question involved is whether in valuing the bequest to Otterbein College the life estate of decedent's widow is to be determined with reference to the established mortality tables, or with reference to the actual physical condition of the widow at the time of decedent's death. A similar question was considered in *Estate of Nellie H. Jennings*, 10 T. C. 323. In that case it is stated, as follows:

> The United States Supreme Court has said that in making a deduction for a remainder interest bequeathed to charity, such as is here under consideration, "the value thereof must be determined from data available at the time of the death of decedent." *United States* v. *Provident Trust Co.*, 291 U. S. 272. We held in the *Estate of John Halliday Denbigh*, 7 T. C. 387, that the use of established mortality tables, which are evidentiary only, must give way to the proven facts which show a less life expectancy. There, the life beneficiary was suffering from cancer in an "inoperable, incurable" form and was doomed to die within a year or two, whereas, according to the mortality table, she had a life expectancy of about sixteen years. Those are much like the facts in the instant case, and we think the same principle governs. The evidence is that at the date of decedent's death the life expectancy of her husband was not more than one year. Actually, he lived only two months. We therefore sustain the petitioner's contention that the valuation of the life estate, which must be deducted from the charitable bequest, should be based upon a life expectancy of not more than one year.

Herein, the widow, past 80 years of age, was confined to her room for about 2 years prior to her death, an almost helpless invalid. The physician who attended her testified in substance that the physical condition was such at the time of the death of the decedent that he expected her death at any moment; that, in his opinion, her life expectancy was, at most, a month, and that her span of life was prolonged only by the excellent care she received. On the facts before us, the contention of the petitioner that the value of the life estate of the widow should be based upon a life expectancy of one year is sustained. *Estate of Nellie H. Jennings, supra*, and *Estate of John Halliday Denbigh, supra*.

The factor used by the respondent in computing the life estate of decedent's widow in the residue was taken from Table A set forth in Regulations 105, sec. 81.10 (i), based upon a rate of 4 per cent. The petitioners do not object to the use of the Combined Experience Table of Mortality, but contend the rate of 4 per cent is too high.

In *William Korn et al., Executors*, 35 B. T. A. 1071, 1078, it is stated:

* * * It is recognized by the Commissioner, frequently, that the rate of 4 percent compounded may not always be a proper rate and the factor is adjusted to adopt another rate of interest if the facts show justification. See *Security-First National Bank of Los Angeles, Executor*, 35 B. T. A. 815. * * *

In *Security-First National Bank of Los Angeles, Executor, supra*, the respondent, in determining the value of decedent's remainder interest in a certain trust created by him used a rate of 5 per cent instead of 4 per cent. See also section 81.44 of Regulations 105, pertaining to deductions for "Transfers for public, charitable, religious, etc., uses," wherein it is stated, in part:

* * * If the present worth of a remainder bequeathed for a charitable use is dependent upon the termination of more than one life, *or in any other manner rendering inapplicable Table A or B of section 81.10*, the claim for the deduction must be supported by a full statement, in duplicate, of the computation of the present worth made, in accordance with the principle set forth in section 81.10, by one skilled in actuarial computations.   [Italics supplied.]

In *Simpson* v. *United States*, 252 U. S. 547, the Supreme Court, in approving the use of Table A, stated that "we take judicial notice of the fact that at the time this tax was collected 4 per cent was very generally assumed to be the fair value or earning power of money safely invested."

The respondent argues that the record shows conclusively that many of the securities produced 4 to 4½ per cent annually and the 99-year leasehold was producing 5 per cent annually. While the 99-year lease produced or yielded 5 per cent on a value at time of death of $240,000, the evidence clearly shows that many of the securities produced less than 4 per cent, and that the annual return on all the property, based upon its value at the time of death, was only 3.497 per cent. The respondent confuses the rate of interest provided for in the securities with the yield based upon the value of the securities at the time of death. The terms do not have the same meaning. The term "yield" is commonly understood to mean the percentage of return on an investment which is computed by dividing the dividend or interest paid thereon by the market price. The value of every item of property includible in the gross estate is the value thereof at the time of decedent's death. Sec. 811, I. R. C. It is that value, and not par value, which must be used to determine the value of the life estate of the widow and the remainder interest of Otterbein College. The evidence shows that 41 per cent of the securities (municipal bonds) yielded only 3.034 per cent based upon the value at the time of death, 16 per cent of the securities (Federal Land Bank loans) yielded 3.033 per cent. It is a well known fact that there had been a continuous decline in the yields on high grade corporate bonds, as well as on governmental bonds, for many years beginning prior to 1944.

In *Hanley* v. *United States* (Ct. Cls.) 63 Fed. Supp. 73, the question to be determined was the value of a remainder interest of an educational institution in a revocable trust created by the decedent subject to the life estate of decedent's widow. The average annual yield on all the corpus based upon the value at the time of the death of decedent was 3.09 per cent. The Commissioner contended that his regulation had the force and effect of law and that his determination based upon Table A (4 per cent) was proper. The court therein stated:

We think the plaintiff is correct in saying that the use of this table is unauthorized and improper whenever its use produces a result substantially at variance with the facts. Indeed, we think that the Regulations themselves recognize this. [Regulations 80, Art. 44, corresponding to Regulations 105, sec. 81.44.]

\* \* \* \* \* \* \*

\* \* \* We think the value of the life estate must be determined according to the situation as it was the time decedent died. Under that situation an annual yield from the estate of appproximately 3 per cent could have been expected by the life tenant. \* \* \*

Under the facts herein, the yield was approximately 3½ per cent. The use of the table based upon the rate of 4 per cent was erroneous because at variance with the facts. The value of the life estate of the decedent's widow must therefore be recomputed according to the Actuaries' or Combined Experience Table of Mortality computed at 3½ per cent and based upon a life expectancy of one year.

The case of *Estate of Abraham Koshland*, 11 T. C. 904 (appeal pending, CA–9, 3/21/49), cited by respondent, is distinguishable. In that case the taxpayer contended that it was unsound to determine the value of a life interest in conformity with Regulations 105, section 81.10 (i), as they were based upon an obsolete mortality table, and that an improper factor for quarterly payment was employed. It was therein held that the taxpayer had shown (a) no error in respondent's use of the Actuaries' or Combined Experience Table included in his regulations and (b) no error in respondent's use of the factor set forth in the regulations applicable to quarterly payments. As above stated, the petitioners herein do not seek to avoid use of the Actuaries' or Combined Experience Table itself for purposes of computation. They contend that the evidence adduced shows that the factors used by respondent were at variance with the facts.

The final question relates to the possible refund of an overpayment. In each of the petitions herein it is alleged that the tax in question is estate tax in the total amount of $41,795.64, including an overpayment of $30,291.25.

It is contended by petitioners that, under sections 871 (a), 900, 911, and 912 of the Internal Revenue Code and Regulations 105, section 81.96 (b), the amount of any estate tax overpaid from funds of Otterbein College is required to be refunded to the college itself. They

contend, in the alternative, that the refund should be made to Huntington National Bank, since under the laws of Ohio the authority of an executor or administrator to represent the estate continues until the estate is fully settled, notwithstanding an order of the probate court, made upon what purported to be the settlement of his final account, which directed that he be discharged from his trust. *Weyer* v. *Watt*, 48 O. St. 545; 28 N. E. 670. It may be pointed out that, although the certified copy of the administration docket of the probate proceedings (Exhibit 1) shows approval of the third and final account of the executor, it contains no entry of an order of the executor's discharge. See sec. 10509-189, Page's Ohio General Code, Ann.

The respondent contends that a refund of any overpayment of estate tax belongs to the estate of decedent and consequently would be "payable only to the legal representative of the estate, Huntington National Bank." Although he states in his brief that such bank would necessarily have to be reinstated by the probate court in order to qualify for further administration of the estate, he also states that the fact that Huntington National Bank had rendered its final accounting as executor was of no moment, for it has been held in the State of Ohio that the final accounting of a fiduciary is not so final as to bar further inquiry as to assets of the estate, citing *McAfee* v. *Phillips*, 25 O. St. 374, also cited by petitioners.

The evidence shows that Otterbein College paid $45,000 to the decedent's executor, which was used by the executor to pay additional estate taxes in January 1947. The notice of transferee liability was mailed January 13, 1948.

It is well settled that the jurisdiction of the Tax Court is limited to the determination of the existence of a deficiency or an overpayment and the amount thereof. As stated in *George H. Jones, Executor*, 34 B. T. A. 280, 283:

> * * * The Board has no authority to order the Commissioner to refund or credit amounts overpaid as taxes. * * * Collection, payment, credit and refund are matters over which the Board has no jurisdiction whatsoever, and which it has no reason to consider, except as they may affect the question of the correctness of the deficiency as determined by the Commissioner. The function of the Board in this case ends when it determines that in fact there has been an overpayment of a certain amount and that a claim for refund was filed within two years after the overpayment was made. * * *

See also *Commissioner* v. *Gooch Milling & Elevator Co.*, 320 U. S. 481; *Estate of Genevieve Brady Macauley*, 3 T. C. 350, 357.

Thus, under section 912 of the Internal Revenue Code,[2] our jurisdiction ends, in the event recomputation under Rule 50 discloses an over-

---

[2] SEC. 912. OVERPAYMENT FOUND BY BOARD.
    If the Board finds that there is no deficiency and further finds that the executor has made an overpayment of tax, the Board shall have jurisdiction to determine the amount

payment of estate tax, when it is determined that there is no deficiency in estate tax, that the executor, Huntington National Bank, has made an overpayment of tax, and that the amount of overpayment was paid within the time provided by the statute.

Certain adjustments were agreed to by the parties, effect to be given thereto upon recomputation under Rule 50.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

OPPER, *J.*, dissenting: Even if the opinion is correct in assuming that we may look at the actual yield of the petitioner estate to determine the invalidity of respondent's assumed interest rate, the record fails to establish that the effective yield of petitioner's investments was in fact less than 4 per cent. Without knowing the tax status of petitioner and its beneficiaries, it is impossible to determine that the tax-exempt securities forming the bulk of the estate corpus did not produce for the owners a net return greatly in excess of the coupon rate. And certainly the failure to adduce the necessary facts can not authorize a determination favorable to petitioner. *Burnet* v. *Houston*, 283 U. S. 223.

The individual situation of an owner of tax-exempt securities is a practical consideration which can not be overlooked.[1] Not only that. but there are legal precedents for such consideration. For example, in *Pennsylvania Co. for Insurances on Lives and Granting Annuities* v. *Gillmore*, 137 N. J. Eq. 51; 43 Atl. (2d) 667, where the question was whether the trustees should dispose of tax-exempt securities, and reinvest in nontax exempts, the court pointed out:

> Counsel for the life tenants * * * have attached to their brief tables to show the result of a sale of all or half of the tax exempts on the life tenants * * * which tables, generally speaking, show * * * "that if the sales are made on the basis as requested in the bill of complaint, and then reinvested on a 2% basis as now suggested, Mrs. Hemsley will sustain a 58% loss in her retained income after payment of income tax; Mrs. Gillmore will sustain a 46% loss * * *."

---

of such overpayment, and such amount shall, when the decision of the Board has become final, be credited or refunded to the executor as provided in section 3770 (a). No such refund shall be made of any portion of the tax unless the Board determines as part of its decision that such portion was paid within three years before the filing of the claim or the mailing of the notice of deficiency, whichever is earlier, or that such portion was paid after the mailing of the notice of deficiency.

[1] "The effect of tax exemption upon investment is due to its value to individuals in high income classes. An individual with a $50,000 income would have to derive a yield of 4.3 per cent from a taxable security to afford him the same yield after Federal income tax as he obtains from a 3 per cent wholly tax-exempt security. * * *" (Testimony of Under Secretary of the Treasury, John W. Hanes, at Hearings before the Committee on Ways and Means on Proposed Legislation Relating to Tax-Exempt Securities, 76th Cong., 1st sess., p. 7.)

The court, after commenting that "these tax exempts are 'blue chip' investments," concluded that "instructions to the trustee will be that it is not its duty to sell all or any part of the securities herein referred to as tax exempts."

I can not concur in the disregard of realities which is required for us to assume that the effective yield on these tax exempts under any facts shown here is the 3 per cent average carried by the coupons. Without that premise, it is impossible to say that the estate yield is actually less than 4 per cent, and the necessity for deciding the difficult legal question of whether the particular situation of any taxpayer warrants a departure from the 4 per cent rate assumed in respondent's regulations would accordingly disappear. I am consequently compelled to dissent from so much of the opinion as disregards the interest rate assumed in respondent's tables.

TURNER, J., agrees with this dissent.