ESTATE OF ELMER F. GOOEL, DECEASED, FRANCES GOOEL, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8390–74. Filed July 18, 1977.

*Richard K. Seltzer,* for the petitioner.
*Richard W. Kennedy* and *Melvern Stein,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in the Federal estate tax due from the Estate of Elmer Gooel, deceased, in the amount of $57,243.14. Various concessions having been made, the only issue remaining for decision is whether petitioner is entitled to an estate tax deduction with respect to a remainder interest in a trust bequeathed to certain charitable organizations.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation, together with the exhibits attached thereto, is incorporated herein by reference.

Elmer F. Gooel (hereinafter referred to as decedent) died testate on May 26, 1970, a resident of Beverly Hills, Calif. Frances Gooel (hereinafter Frances), the decedent's surviving spouse, was duly appointed executrix. At the time of filing the petition herein, Frances resided in Beverly Hills, Calif.

Petitioner filed a Federal estate tax return with the District Director of Internal Revenue, Los Angeles, Calif.

Decedent's will, dated October 27, 1967, was admitted to probate on June 18, 1970. After making certain specific bequests, decedent left the residue of his estate in trust to Union Bank, a California corporation. Frances was required to waive her interest in the community property included in decedent's estate to become a beneficiary of the trust. Frances elected to take under the terms of the will.

Article Sixth of the will provided in part as follows:

1. The net income of this Trust shall be distributed in monthly installments to or for the benefit of my wife during her lifetime.

2. In the event the total amount of income from this Trust received by my wife should be less than Twenty Thousand Dollars ($20,000.00) annually, my trustee shall distribute to my wife such sums from the principal of this Trust as are necessary to make the total amount of income and principal received by my wife from this Trust equal to Twenty Thousand Dollars ($20,000.00) annually. Every three years after my death my trustee shall increase this Twenty Thousand Dollar ($20,000.00) standard by Ten percent (10%). Therefore, three years after my death the standard shall be Twenty-Two Thousand Dollars ($22,000.00); six years after my death the standard shall be Twenty-Four Thousand, Two Hundred Dollars ($24,200.00), etc. My trustee shall apply the then current standard in determining what amount, if any, of the principal of this Trust shall be distributed to my wife under the terms of this paragraph.

3. In addition to the distribution of trust income and the distributions called for in Paragraph 2 above, my trustee may pay to or apply for the benefit of my wife such amounts of principal of the Trust as it determines necessary to provide for my wife's health, maintenance and support considering other sources available for such purposes and considering her standard of living at the time of my death.

## Article Twelfth of the will provided:

If at any time during the existence of the trust created by this Will the trust estate shall contain real property used as my residence at the time of my death, my trustee shall allow my wife to live in said property so long as she may desire to do so, free of rent, and my trustee shall pay the taxes, expenses of maintaining the property in suitable repair, mortgage payments and insurance premiums for insurance on said property. Said mortgage payments shall be made from principal and shall be in addition to all other payments herein to be made to or for the benefit of my wife. All payments for taxes, expenses of maintaining the property in suitable repair, insurance premiums and all other expenses in connection with said property shall be paid from the income. In the event my wife desires said property be sold, my trustee may, in his discretion, sell such property. If said property is sold, my trustee may purchase a residence to be used by my wife of similar or lesser

value and shall make all of the payments called for above and in the manner provided above and shall allow my wife to live in said property free of rent.

Upon the death of decedent's wife, in the event that she predeceased decedent, or if she elected not to take under the will, the corpus of the trust was to be distributed to various charitable institutions, all of which are qualified charitable organizations for purposes of section 2055.[1]

The trustee was given broad powers under article Seventh of the will. Subject to the requirement that it exercise the judgment "which men of prudence, discretion and intelligence exercise in the management of their own affairs * * * considering the probable income as well as the probable safety of their capital," it was given power to:

(i) Acquire and hold every kind of property;

(ii) Invest in mutual funds;

(iii) Retain property held by decedent at the time of his death, including unproductive real property;

(iv) Determine how all receipts and disbursements should be allocated between income and principal.

In October 1974, Frances, as executrix, filed a document with the Superior Court of the State of California for the County of Los Angeles wherein the court was requested to find that article Seventh of the will required the trustee to credit or appoint all receipts or disbursements in accordance with the provisions of the California Principal and Income Law, Cal. Civ. Code secs. 730 through 730.17, and that, by virtue of paragraph E of article Seventh, the trustee was given authority to determine how receipts and disbursements shall be allocated between income and principal only for those receipts and disbursements not covered by that law. Representatives of respondent were given notice that such an instruction would be sought prior to the filing of the document. An order including an instruction to this effect was filed by the Superior Court on November 25, 1974.

The decedent's assets consisted exclusively of community property. The aggregate value of the property listed in the estate tax return as of decedent's date of death was $795,074.[2]

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.

[2] The aggregate value of this property reported on the estate tax return was

From this, the following items must be subtracted to determine the value of the initial corpus of the trust:[3]

| Item | Amount |
| --- | --- |
| Debts of the estate | $25,682.00 |
| Mortgages on property included in estate | 60,597.00 |
| Funeral expenses | 2,144.00 |
| Life insurance proceeds not payable to estate | 61,325.00 |
| Specific bequests of property | 6,893.00 |
| Charitable cash bequests | 7,000.00 |
| Noncharitable cash bequests | 8,250.00 |
| Widow's allowance—paid out of corpus | 111,600.00 |
| Attorney's fees incurred in administration of the estate | 12,702.00 |
| Tax Court trial counsel fees | 6,000.00 |
| Expert witness fees | 3,070.00 |
| California State inheritance taxes | 663.60 |
| Total | [4]305,926.60 |

Frances waived all commissions or fees to which she may have been entitled for her services as executrix. Thus, the initial value of the corpus of the trust equaled $489,147.40, less the Federal estate tax liability.

Included in the estate was the house used as a residence by decedent and Frances, which was valued at the time of decedent's death at $120,000. Under article Twelfth of the will, Frances was to be permitted to live in this house free of rent. The will directed that expenses incurred with regard to the house were to be paid from the trust and charged to the trust income, with the exception of payments on the mortgage which were to be charged to principal,[5] as follows:

| | |
| --- | --- |
| Taxes | $2,405 |
| Insurance | 631 |
| Repairs | 800 |
| Pest control | 92 |
| Gardener | 1,400 |

---

$763,032. The parties have agreed to various adjustments, the net effect of which is to increase the aggregate value to $795,074. This figure encompasses the total value of the community property, although only one-half thereof was actually included in the gross estate.

[3] An amount equal to the Federal estate tax liability of the estate, which is in dispute herein, must also be deducted in calculating the corpus of the trust.

[4] An additional $28,800 for the 12-month period from November 1973 through October 1974 was paid as a family allowance and charged to income. We do not reach the issue of the propriety of such charge. See p. 510 *infra*.

[5] As far as can be gleaned from the record, the unpaid amount of the mortgage was extremely small at the date of death and was paid off shortly thereafter.

| | |
|---|---|
| Utilities | 1,128 |
| Total | 6,456 |

Frances was born on July 14, 1910. The life expectancy of a person born on July 14, 1910, on the date of decedent's death, is 15.93 years, using United States Life Table No. 38, or 19.52 years, using United States Life Table 1959–61. As of the date of decedent's death, the probability that Frances would survive a certain number of years is as follows:

| Number of years | Data from U.S. Life Table No. 38 | Data from U.S. Life Table 1959–61 |
|---|---|---|
| 24 | 19.22% | 34.00% |
| 25 | 16.18% | 29.93% |
| 26 | 13.42% | 25.91% |
| 27 | 10.93% | 22.02% |

### ULTIMATE FINDING OF FACT

The possibility that the trust corpus will be exhausted prior to Frances' death is not so remote as to be negligible.

### OPINION

In its Federal estate tax return, petitioner claimed a deduction for the value of the remainder of the testamentary trust in favor of certain concededly charitable organizations. The questions before us are whether the powers granted to the trustee of the testamentary trust are so broad as to prevent the value of the charitable remainder from being presently ascertainable and, if not, whether the standards of distribution in favor of the surviving spouse create a risk that the corpus of the trust will be exhausted prior to her death that is not so remote as to be negligible. Because of the decision we reach on the latter issue, we need not decide whether the trustee's powers are such as to require the disallowance of the deduction.[6]

---

[6] We note that the value of a charitable bequest of the type involved herein may not be presently ascertainable, and thus not deductible, because the trustee possessed certain administrative powers which, under State law, could be used for the benefit of the life tenant as against the charitable remaindermen. *Gardiner v. United States,* 458 F.2d 1265 (9th Cir. 1972); *Rand v. United States,* 445 F.2d 1166 (2d Cir. 1971); *Miami Beach First National Bank v. United States,* 443 F.2d 475 (5th Cir. 1971); *Estate of Stewart v. Commissioner,* 436 F.2d 1281 (3d Cir. 1971), revg. 52 T.C. 830

Because decedent died prior to October 9, 1972, and decedent's will was executed prior to October 9, 1969, and not republished, the controlling law is that in effect prior to the Tax Reform Act of 1969. Pub. L. 91–172, sec. 201(g)(4), 83 Stat. 487, 565.

Under the Estate Tax Regulations, a deduction for a charitable remainder of a testamentary trust will be allowed only if two requirements are satisfied. See *Estate of Stewart v. Commissioner,* 52 T.C. 830, 833 (1969), revd. on other grounds 436 F.2d 1281 (3d Cir. 1971); *Estate of Varian v. Commissioner,* 47 T.C. 34, 48 (1966), affd. per curiam 396 F.2d 753 (9th Cir. 1968). First, the deduction is limited to the extent that the interest going to charity is presently ascertainable. Sec. 20.2055–2(a), Estate Tax Regs. Second, if it is possible that no amount will ultimately go to charity, the deduction will not be allowed "unless the possibility that the charitable transfer will not become effective is so remote as to be negligible." Sec. 20.2055–2(b), Estate Tax Regs. See *Estate of Moffett v. Commissioner,* 31 T.C. 541, 546 (1958), affd. 269 F.2d 738 (4th Cir. 1959); *Estate of Buckwalter v. Commissioner,* 46 T.C. 805, 819 (1966); Taggart, "Charitable Deductions for Transfers of Remainder Interests Subject to Invasion," 21 Tax L. Rev. 535, 562–564 (1966). The issue of remoteness is factual. See *Jones v. United States,* 395 F.2d 938, 942 (6th Cir. 1968); *Estate of Buckwalter v. Commissioner, supra.*

Respondent is not arguing, as he does in the usual case in this area, that either of the provisions for invasion of principal, in the event of insufficiency of trust income, creates a power of invasion that is not limited by a measurable standard. Compare, e.g., *Henslee v. Union Planters Nat. Bank & Trust Co.,* 335 U.S. 595 (1949), and *Merchants Nat. Bank v. Commissioner,* 320 U.S. 256 (1943), with *Ithaca Trust Co. v. United States,* 279 U.S. 151 (1929). The thrust of his argument is that the second distribution standard, which directs the

---

(1969). But cf. *Martinez v. Commissioner,* 67 T.C. 60 (1976); *Estate of Speer v. Commissioner,* 57 T.C. 804 (1972). We are reluctant to decide this case solely on the basis of the trustee's administrative powers because of the procedures established in Rev. Proc. 74–6, 1974–1 C.B. 417, superseding Rev. Proc. 73–9, 1973–1 C.B. 758, which would allow a deduction where the trustee's powers are the only barrier to the deduction, if all interested parties entered into an agreement that the powers would be exercised in an impartial manner, and if the dispositive instrument did not demonstrate an intent to favor the life beneficiaries.

trustee to distribute to Frances $20,000 per year for each of the first 3 years following decedent's death (and to increase such amount by 10 percent every 3 years thereafter) and which further directs the trustee to invade corpus to the extent that the net income of the trust is less than such an amount, creates a non-negligible risk that the charitable remainderman will not get any portion of the corpus. We hold that this position should be sustained.

The parties agree that the likelihood of invasion depends upon three factors: the value of the corpus initially placed in the trust; the applicable rate of return on the corpus; and the age of Frances at the date of death. Corpus will be invaded each year to the extent that the amount of $20,000 (or the applicable increased amount) exceeds the net income from the trust corpus. The amount of such invasion reduces the size of the corpus which would produce income in the following year.[7]

In calculating the value of the initial corpus of the trust, such items as specific bequests, claims against the estate, and administration expenses must be deducted from the value of the assets involved.[8] See *Estate of Alexander v. Commissioner*, 25 T.C. 600, 612 (1955). The disputed items concern the amount of the deductions for the estate tax liability and for the family support payments made to Frances during the period of administration which were charged to income of the estate. Since we have determined that resolution of the disputes as to these items would not affect the result we reach herein, we initially assume without deciding that, as petitioner contends, the estate tax liability is $3,256, and the trust corpus should not be reduced by the portion of the family allowance charged to income.[9]

The principal bone of contention between the parties is over the rate of return expected on the trust corpus. Petitioner

---

[7] Because the parties agree that this is the proper method for purposes herein, we need not decide if some other method of valuation is preferable. Cf. *Estate of Duker v. Commissioner*, 18 T.C. 887 (1952).

[8] In view of Frances' election, the "assets involved" herein include not only those passing by virtue of the residuary clause of the will, but also the value of Frances' share of the assets constituting community property. See *Estate of Christ v. Commissioner*, 480 F.2d 171 (9th Cir. 1973), affg. 54 T.C. 493 (1970).

[9] The amount of this item was $28,800 and is in addition to the $111,600 charged to corpus.

contends that the proper rate of return for such corpus (excluding decedent's residence) was in excess of the 3.5 percent permitted under section 20.2031–7, Estate Tax Regs.[10] In support of this contention, evidence was introduced to show that the rate of return on certain grades of corporate bonds, issued on and shortly after the date of decedent's death, was in excess of 8 percent and that the trustee would have been well advised to invest all of the trust corpus in such bonds. Such evidence falls far short of that needed to persuade us that a rate other than that contained in the regulations should be used.

The rate of interest set forth in section 20.2031–7, Estate Tax Regs., is not set in concrete and, if it can be shown that use of the 3.5-percent rate is at variance with the facts, the "true" rate can be used. *Estate of Alexander v. Commissioner, supra* at 613–614; *Huntington National Bank v. Commissioner,* 13 T.C. 760, 770–772 (1949); *Hanley v. United States,* 63 F.Supp. 73 (Ct. Cl. 1945). Proof that the rate contained in the regulations is at variance with the facts must specifically relate to the rate of return on the particular assets which comprise the trust corpus. Evidence of the rate of return available on assets not included in the trust is not probative of the rate of return on trust assets. See *Florida National Bank of Jacksonville v. United States,* an unreported case (S.D. Fla. 1962, 10 AFTR 2d 6179, 62–2 USTC par. 12,082); *Estate of Alexander v. Commissioner, supra.* Included in the estate were several parcels of real property (in addition to decedent's residence), shares of common stock, and bonds which may have been tax-exempt.[11] Petitioner has not introduced any evidence concerning the rate of return on these assets, nor has it demonstrated which assets of the estate were to be used to discharge specific bequests or debts of (or claims against) the estate and which were to be placed in the residuary trust. Moreover, to the extent that the actual rate of return on assets may justify nonuse of respondent's tables (see, e.g., *Huntington National Bank v. Commissioner, supra*), petitioner

[10] Sec. 20.2055–2, Estate Tax Regs., provides that the present value of a remainder is to be made in accordance with the rules stated in sec. 20.2031–7, Estate Tax Regs., in respect of decedents dying before Jan. 1, 1971.

[11] The first accounting of the executrix shows that as of Dec. 31, 1973, most of these assets were still on hand.

has failed to prove that such return on the assets involved herein would exceed 3.5 percent.[12]

In short, to sustain petitioner's contention, we would have to accept the premise that all of the trust corpus would be invested in certain corporate bonds (a premise based upon facts which, as far as we can determine, have not occurred) or that the actual rate of return on the assets involved was in excess of 3.5 percent (which it was not). Thus, we cannot say that a 3.5-percent rate of return is at variance with the facts. See *Estate of Christ v. Commissioner*, 480 F.2d 171 (9th Cir. 1973), affg. 54 T.C. 493 (1970).[13]

We turn next to the question of the impact of Frances' life expectancy on the issue of remoteness of the charitable remainder. Having decided that a 3.5-percent rate of return should be used, we conclude that rate should also be applied to determine the amount of income against which the possibility and extent of invasion should be measured. See *Estate of Alexander v. Commissioner, supra* at 614; *Florida National Bank of Jacksonville v. United States, supra.* Cf. *In re Estate of Judge*, 371 F.Supp. 716 (M.D. Pa. 1974).[14]

---

[12] The estate's tax returns show net income of $7,705.44 for 1971, $1,386.89 for 1972, and $9,258.92 for 1973. To these figures, there, of course, must be added approximately $2,700 of tax-exempt income annually. On the other hand, these figures do not reflect any deductions for the expenses of the residence (see p. 513 *infra*) or for commissions, although the record indicates that annual trustee's commissions were projected at $3,500.

[13] In passing, we note that respondent argues that the 3.5-percent figure is correct, and that the value of decedent's residence should be excluded from the trust corpus in calculating the expected net income of the trust. We believe that the rate of return specified in the regulations reflects an average, expected return. Respondent cannot choose to apply the actual rate of return for one asset unless he can show that the overall rate of return for the trust corpus is less than 3.5 percent.

[14] See also *Estate of Bachman v. Commissioner*, T.C. Memo. 1975–186. It is arguable that the actual projected income rather than the imputed income based on the actuarial tables should be used for determining the possibility, or extent of invasion. Cf. *Estate of Schildkraut v. Commissioner*, 368 F.2d 40, 47–48 (2d Cir. 1966), revg. T.C. Memo. 1965–239. See Taggart, "Charitable Deductions for Transfers of Remainder Interests Subject to Invasion," 21 Tax L. Rev. 535, 563–564 (1966). In view of the fact that the evidence herein is insufficient to show that the actual projected income is more than the imputed income (see n. 12 *supra*) and our holding that there is more than a remote possibility of invasion using the imputed income standard (see pp. 515–516 *infra*), we need not reexamine this question or the related question as to whether the potential for future increase in income and expenses of the trust, e.g., due to inflation, should be taken into account.

Under the second distribution standard contained in the will, Frances was entitled to receive from the trust $20,000 for each of the first 3 years, $22,000 in each of the following 3 years, $24,200 in each of the next 3 years, and so on. If the net income of the trust was insufficient to provide the designated sum, corpus was to be invaded to supply it. The trust was also required under article Twelfth of the will to pay certain expenses for the maintenance of decedent's residence so long as Frances continued to reside there. These expenses amounted to $6,456 on an annual basis (excluding payments on the mortgage) at the time of decedent's death. The parties disagree as to how these expenses should be counted, petitioner contending that they should be considered as a charge against income and respondent arguing, on the basis of the manner in which they were handled in the accounting by the executrix, that they should be considered as a charge against principal. As we view the situation, it is unnecessary for us to resolve this question or the further question which the parties have not discussed, namely, whether even if such expenses should be treated as a charge against income, the proper construction of articles Sixth and Twelfth of the will requires that they nevertheless be considered in addition to, and not a part of, the designated sum required to be paid each year to Frances. As will subsequently appear, even if we assume (as we do for purposes of decision herein) that such expenses should be charged to income and should be considered part of the designated annual sum, petitioner's claim to a charitable deduction still fails. Obviously, if either or both of the foregoing assumptions are not valid, the possibility of invasion of corpus would increase and a fortiori petitioner would not be entitled to the charitable deduction. In connection with the foregoing, we are constrained to note that both assumptions are not entirely free from doubt and that, as to the second assumption, it can be argued that the will is sufficiently ambiguous to have required petitioner to produce evidence of the decedent's intent in order to satisfy its burden of proof. Rule 142, Tax Court Rules of Practice and Procedure.

The decided cases clearly establish the principle that, in cases such as this, the calculation as to the possibility and extent of invasion is not limited to Frances' life expectancy.

Rather, the projected chance of Frances' survival to an age when the trust corpus will be exhausted is to be calculated and the question of remoteness determined in light of that chance. *Estate of Moffett v. Commissioner,* 269 F.2d 738 (4th Cir. 1959), affg. 31 T.C. 541 (1958); *United States v. Dean,* 224 F.2d 26 (1st Cir. 1955); *Florida National Bank of Jacksonville v. United States, supra.* See also Rev. Rul. 70–452, 1970–2 C.B. 199.[15]

We recognize that *Estate of Schildkraut v. Commissioner,* 368 F.2d 40 (2d Cir. 1966), revg. T.C. Memo. 1965–239, relied upon by petitioner, points in the opposite direction. In that case, the Court of Appeals held that, where the charitable remainder interest is subject to an annual invasion and there is "assurance" that the remaindermen will take something at the end of the normal life expectancy of the income beneficiary, some deduction should be allowed. But, that case involved a special situation, where the technical statutory requirement mandated the disallowance of the marital deduction, and the further disallowance of the charitable deduction because of the possibility of invasion would have produced a highly inequitable result. The Court of Appeals stated that "a crucial fact here certainly is that the entire corpus must go in whole or in part either to the widow or to the Foundation, both tax-free recipients if the corpus were bequeathed to them directly." See 368 F.2d at 49. See also Mertens, Law of Federal Gift and Estate Taxation, III Cum. Supp. 263–264 n. 53.15. Such is not the case herein, where, since the decedent's estate consisted solely of community property, no marital deduction is allowable, but the estate gets the equivalent of the marital deduction without the necessity of complying with the detailed conditions of section 2056 by virtue of Frances' community property rights. See sec. 2056(c). In view of the foregoing, *Schildkraut* is clearly distinguishable.[16]

---

[15] The issue involved herein was not before the Court in *Estate of O'Brien v. Commissioner,* 57 T.C. 27 (1971), or *Estate of Duker v. Commissioner, supra.*

[16] Compare *Colorado Springs National Bank v. United States,* 255 F.Supp. 390, 395 (D. Colo. 1966), where there was also an interplay between the marital deduction and certain charitable deductions and the court stated "Logical consistency does not demand that the deductions [charitable] be allowed by reason of the disallowance of the marital deduction."

By way of summary for purposes of decision herein, we have calculated the initial corpus of the trust at $489,147.40, less the assumed estate tax liability of $3,256, or $485,891.40, and have decided that the rate of return on the trust corpus was 3.5 percent. Under the second distribution standard and our assumptions in respect thereof (see p. 513 *supra*), Frances is entitled to receive from the trust $20,000 for each of the first 3 years, $22,000 in each of the next 3 years, $24,200 in each of the following 3 years, and so on.

Based upon these facts, we calculate that all of the corpus will be invaded for the benefit of the surviving spouse within 27 years of the date of decedent's death, at which time she would be 87. See the following table:

TABLE I

| Year | Corpus[1] | Income[2] | Distribution | Invasion |
|---|---|---|---|---|
| 1 | $485,891 | $17,006 | $20,000 | $2,994 |
| 2 | 482,897 | 16,901 | 20,000 | 3,099 |
| 3 | 479,798 | 16,793 | 20,000 | 3,207 |
| 4 | 476,591 | 16,681 | 22,000 | 5,319 |
| 5 | 471,272 | 16,495 | 22,000 | 5,505 |
| 6 | 465,767 | 16,302 | 22,000 | 5,698 |
| 7 | 460,069 | 16,102 | 24,200 | 8,098 |
| 8 | 451,971 | 15,819 | 24,200 | 8,381 |
| 9 | 443,590 | 15,526 | 24,200 | 8,674 |
| 10 | 434,916 | 15,222 | 26,620 | 11,398 |
| 11 | 423,518 | 14,823 | 26,620 | 11,797 |
| 12 | 411,721 | 14,410 | 26,620 | 12,210 |
| 13 | 399,511 | 13,983 | 29,282 | 15,299 |
| 14 | 384.212 | 13,447 | 29,282 | 15,835 |
| 15 | 368,377 | 12,893 | 29,282 | 16,389 |
| 16 | 351,988 | 12,320 | 32,210 | 19,890 |
| 17 | 332,098 | 11,623 | 32,210 | 20,587 |
| 18 | 311,511 | 10,903 | 32,210 | 21,307 |
| 19 | 290,204 | 10,157 | 35,431 | 25,274 |
| 20 | 264,930 | 9,273 | 35,431 | 26,158 |
| 21 | 238,772 | 8,357 | 35,431 | 27,074 |
| 22 | 211,698 | 7,409 | 38,974 | 31,565 |
| 23 | 180,133 | 6,305 | 38,974 | 32,669 |
| 24 | 147,464 | 5,161 | 38,974 | 33,813 |
| 25 | 113,651 | 3,978 | 42,872 | 38,894 |
| 26 | 74,759 | 2,616 | 42,872 | 40,256 |
| 27 | 34,503 | 1,208 | 42,872 | 41,664 |

[1] Includes reduction for estate tax liability of $3,256.
[2] Income calculated on the basis of a rate of return of 3½ percent.

According to data contained in United States Life Table No. 38 and United States Life Table 1959–61, the chances that

Frances would survive 27 years from the date of decedent's death were 10.93 percent and 22.02 percent, respectively.[17] Accordingly, we conclude that the probability that the corpus will be exhausted prior to the death of the life tenant is not so remote as to be negligible. See *Estate of Moffett v. Commissioner, supra* (19-percent or 29-percent chance that a 50-year-old woman would survive to age 80 not so remote as to be negligible); *United States v. Dean, supra* (9-percent chance that a woman aged 82 would outlive two women aged 67 and 68 not so remote as to be negligible); *Florida National Bank of Jacksonville v. United States, supra* (19.9-percent chance that a 55-year-old woman would survive to age 83 not so remote as to be negligible).

Moreover, if we were to decide that some greater probability of complete invasion were required to disallow the charitable deduction, petitioner would still be unsuccessful. For example, the probability that Frances would survive at least 24 years from the date of decedent's death is 19.2 percent, based upon United States Life Table No. 38, or 34 percent, based upon United States Life Table 1959–61. Clearly, the likelihood of Frances surviving 24 years is not so remote as to be negligible. According to our calculations, at the end of 24 years $113,651 in corpus would remain. Petitioner would only be entitled to a charitable deduction for the present value of that amount, or $49,774.[18] However, if petitioner were entitled to a charitable deduction of this magnitude, its estate tax liability would increase to $58,063, an increase of $54,807. This would reduce the initial corpus of the trust to $431,084. Using the rate of return and distribution schedule specified above, all of the corpus would be invaded for Frances' benefit within 24 years. See the following table:

---

[17] It has been indicated that the use of the more recent 1959–61 tables is more appropriate. See *Jones v. United States*, 395 F.2d 938, 942 (6th Cir. 1968).

[18] The present value of a remainder interest postponed for a term certain of 24 years is .437957 multiplied by the amount of the remainder. Sec. 20.2031–7, table II, Estate Tax Regs.

TABLE II

| Year | Corpus[1] | Income[2] | Distribution | Invasion |
|------|-----------|-----------|--------------|----------|
| 1 | $431,084 | $15,088 | $20,000 | $4,912 |
| 2 | 426,172 | 14,916 | 20,000 | 5,084 |
| 3 | 421,088 | 14,738 | 20,000 | 5,262 |
| 4 | 415,826 | 14,554 | 22,000 | 7,446 |
| 5 | 408,380 | 14,293 | 22,000 | 7,707 |
| 6 | 400,673 | 14,024 | 22,000 | 7,976 |
| 7 | 392,697 | 13,744 | 24,200 | 10,456 |
| 8 | 382,241 | 13,378 | 24,200 | 10,822 |
| 9 | 371,419 | 13,000 | 24,200 | 11,200 |
| 10 | 360,219 | 12,608 | 26,620 | 14,012 |
| 11 | 346,207 | 12,117 | 26,620 | 14,503 |
| 12 | 331,704 | 11,610 | 26,620 | 15,010 |
| 13 | 316,694 | 11,084 | 29,282 | 18,198 |
| 14 | 298,496 | 10,447 | 29,282 | 18,835 |
| 15 | 279,661 | 9,788 | 29,282 | 19,494 |
| 16 | 260,167 | 9,106 | 32,210 | 23,104 |
| 17 | 237,063 | 8,297 | 32,210 | 23,913 |
| 18 | 213,150 | 7,460 | 32,210 | 24,750 |
| 19 | 188,400 | 6,594 | 35,431 | 28,837 |
| 20 | 159,563 | 5,585 | 35,431 | 29,846 |
| 21 | 129,717 | 4,540 | 35,431 | 30,891 |
| 22 | 98,826 | 3,459 | 38,974 | 35,515 |
| 23 | 63,311 | 2,216 | 38,974 | 36,758 |
| 24 | 26,553 | 929 | 38,974 | — |

[1] Includes reduction for estate tax liability of $58,063.

[2] Income calculated on the basis of a rate of return of 3½ percent.

To reflect various concessions by the parties,

*Decision will be entered under Rule 155.*