ESTATE OF GEORGE H. MOOR, DECEASED, BANCOHIO NATIONAL BANK (formerly THE OHIO NATIONAL BANK OF COLUMBUS), EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Moor v. Commissioner
Docket No. 6659-80.
United States Tax Court
T.C. Memo 1982-299; 1982 Tax Ct. Memo LEXIS 446; 43 T.C.M. (CCH) 1530; T.C.M. (RIA) 82299; May 27, 1982. Barry R. Robinson and David A. Swift, for the petitioner. Eugene P. Bogner, for the respondent. SCOTT MEMORANDUM OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal estate tax of the estate of George H. Moor, deceased, BancOhio National Bank, executor, in the amount of $9,861.75. The sole issue for decision is whether the estate is entitled to charitable deductions under section 2055 [1] for the charitable interests in two trusts which decedent had directed to be established. *448 All of the facts have been stipulated and are found accordingly. BancOhio National Bank (formerly known as the Ohio National Bank of Columbus), executor of the estate of George H. Moor, filed a Federal estate tax return with the Internal Revenue Service Center, Cincinnati, on February 28, 1977. At the time the petition was filed in this case, BancOhio National Bank, an Ohio corporation, had its principal place of business in Columbus, Ohio. Decedent, George H. Moor, died testate on June 6, 1976, and was survived by his widow, Elsie I. Moor, and his two sons, George H. Moor, Jr., and Elvin Moor. At the time of his death, most of Mr. Moor's assets were held in the Eorge Moor Living Trust. This trust was revocable during Mr. Moor's life but was to become irrevocable upon his death. [2] During Mr. Moor's life, the trustee was required to pay all income of the trust to Mr. Moor. Additionally, the trustee was also required to follow any written directions of Mr. Moor concerning investment of the trust assets. Upon Mr. Moor's death, certain provisions contained in the trust instrument were to go into effect. These provisions concerned his wife's use of their Westwood residence *449 during her life and the setting up of certain further individual trusts for the benefit of Mr. Moor's family and his housekeeper with the remainder interests in such trusts to go to charity. The trust instrument provided that if the property constituting the residence was still held in the trust at Mr. Moor's death, the property was to be divided into two specified parcels. The northern half of the property upon which the Moor home was located was within six months after Mr. Moor's death to be offered to Mrs. Moor for her occupancy during the remainder of her life. If Mrs. Moor expressed that it was her wish to so use the property, the trustee was directed to execute a deed conveying her a life estate in this parcel on which the home was located. Mrs. Moor was required to use this property as a residence. If she left the property vacant for more than two months or otherwise violated the terms of her life tenancy or *450 voluntarily gave up her right of occupancy, the property would revert to the trust. As to the second specified parcel, the trustee was directed to sell such property and administer the proceeds as part of the trust funds. Additionally, the trustee was directed to set aside a fund of $ 50,000 if Mrs. Moor survived Mr. Moor. The fund was to be used at the trustee's discretion for (1) the payment of extraordinary items required for the upkeep and maintenance of the residence during Mrs. Moor's occupancy and (2) payment of her medical, hospital, and nursing expenses in the case of illness or accident. However, if Mrs. Moor did not exercise her right to occupy the residence or if she subsequently vacated the residence and gave up her life tenancy, the trustee was directed to distribute the net income of the fund to her currently during her lifetime. The trust further provided that the trust funds not required above to be set aside for Mrs. Moor be used to set up four trusts. The first trust, Trust A, was for the benefit of Mrs. Moor in the event she survived Mr. Moor. The trust corpus of Trust A was to consist of property having a fair market value of $ 215,000 and the trustee *451 was directed to pay Mrs. Moor during her lifetime an annuity of $ 15,050 (or 7 percent of the initial value of the corpus). Trusts B-1 and B-2 were individual trusts each for the benefit, respectively, of Mr. Moor's two sons, George H. Moor, Jr., and Elvin Moor. Trusts B-1 and B-2 were identical. Each trust was to have a corpus consisting of property having a fair market value of $ 70,000. The trustee was directed to pay each son an annuity of $ 4,900 (or 7 percent of the initial value of the trust corpus) during his lifetime. Trust B-3 was a trust for the benefit of Mary Elizabeth Saunders, the Moors' housekeeper. Trust B-3 was to have a corpus consisting of property with a fair market value of $ 18,000. The trustee was directed to pay Ms. Saunders an annuity of $ 1,260 (or 7 percent of the initial value of the corpus) during her lifetime. If there were insufficient funds to fund the four trusts, Trust A for the benefit of Mrs. Moor was to be first fully funded. Any remaining funds were to be allocated to fund Trusts B-1, B-2, and B-3 in proportion to the respective annuities provided above, but the annuities actually payable were to be reduced to an amount equal to 7 percent *452 of the reduced corpus of each of the trusts. The trust instrument further provided with respect to the funding of the trusts and the payment of the annuities: (a) The annuity shall be paid in monthly installments at the close of each month from income and, to the extent that income is not sufficient, from principal. As to each Trust any income for a taxable year in excess of the annuity amount shall be added to principal. The obligation to pay the annuity shall begin as of the date of my death and shall continue until the death of the Annuitant. At and after the death of the Annuitant the trust funds shall be held and administered as provided in Item VI. (b) The actual funding of these charitable remainder annuity trusts probably cannot be completed or finally determined until some time after my death. Accordingly, the requirement to pay the annuity may be deferred in each case until the end of a reasonable period of administration of my Estate or the complete funding of the Trust, whichever occurs earlier. Payment of the Annuity amounts so deferred, plus interest computed at 6 percent a year, compounded annually, shall be made within a reasonable time after the occurrence *453 of said event. As to each Trust, if the initial fair market value of the assets constituting the Trust is incorrectly determined by the Trustee under Item IV(b), the annuity shall be adjusted to an amount equal to 7 percent of the corrected initial fair market value, if different from the principal sum stated in Item IV(a). Then within a reasonable period after said final determination the Trustee shall pay to the Annuitant (in the case of an underpayment) or must receive from the Annuitant (in the case of an overpayment) the difference between the total of the amounts actually paid during the intervening period and the total of the amounts payable. (d) No provision of this Trust Instrument applicable to such charitable remainder annuity trusts shall be construed to restrict the Trustee from investing the Trust assets in a manner which could result in the annual realization of a reasonable amount of income or gain from the sale or diposition of Trust assets. (f) As to each such charitable remainder annuity trust no additional contribution shall be made to the Trust after the initial contribution. It is understood, however, that all property passing to the Trust by reason of *454 my death, if distributed during the reasonable period of administration of my Estate, shall be considered as one contribution. Under item VI of the trust instrument, it was directed that upon the death of the life annuitant of each of the trusts described above, Trusts A, B-1, B-2, and B-3, the trust assets in such trust were to be used to set up two further, separate trusts. The first of these trusts was a trust to be used as an endowment fund for a professorship in business administration at Capital University of Bexley, Ohio, to be known as the George H. Moor Chair. The second of these trusts was a trust for Lutheran Senior City, Inc., of Columbus, Ohio (an institution of the American Lutheran Church) to be known as the George H. Moor Fund. The funds in the second trust were to be used to promote comfort, health and happiness of the residents as determined by the administrator or governing board of the Lutheran Senior City. Any funds in excess of the amounts needed to fund the trusts for Mr. Moor's widow, sons, and housekeeper were also to go to the trusts for Capital University and Lutheran Senior City, Inc. Both Capital University and Lutheran Senior City, Inc. are qualified *455 charitable organizations for the purpose of section 2055. On April 22, 1974, George H. Moor executed a will. Under this will, Mr. Moor left all his clothing, jewelry, books, household furniture, and other personal effects to his wife. His wife, under the will, was also given her choice of any one of the automobiles which Mr. Moor owned at his death. Two specific bequests, each in the amount of $ 500, were left to Mr. Moor's two sons, George H. Moor, Jr., and Elvin Moor. Except for these specific bequests to Mr. Moor's wife and to his two sons, the rest of the estate under the will was subject to a pour-over provision. Under this pour-over provision, the residue of the estate was to be given over to the trustee of the George H. Moor Living Trust, such residue to be administered and distributed as a part of the trust in accordance with the terms and provisions contained in the trust instrument. The BancOhio National Bank was named in the will executed on April 22, 1974, as executor of Mr. Moor's estate. The bank had also been named in the trust instrument as the trustee of the George H. Moor Living Trust. It served in that capacity until the establishment of the trusts provided *456 for in Mr. Moor's will of which it became trustee. On April 15, 1976, George H. Moor executed a codicil to his April 22, 1974, will. The only change made by the codicil was that the $ 500 bequests made to each of his sons were revoked. George H. Moor died on June 6, 1976. On June 16, 1976, the April 22, 1974, will, with the April 16, 1976, codicil to such will, was admitted to probate by an Ohio State Court. The Ohio State Court also approved the appointment of BancOhio National Bank as executor of decedent's estate. At the date of his death of June 6, 1976, decedent owned the following assets outright outside of the George H. Moor Living Trust: (1) a $ 10,000 New York City revenue anticipation note bearing interest at 9.4 percent due January 12, 1976, valued at $6,374.97; (2) $ 26,195.55 consisting of $ 4,404.21 of funds in checking and savings accounts and $ 21,791.34 in a promissory note from the George H. Moor, Inc. corporation bearing interest at 6 percent dated January 1, 1976; and (3) $ 2,009.52 of miscellaneous household goods and personal effects. As of July 6, 1976, the Eorge H. Moor Living Trust held the following assets: an extensive securities portfolio, *457 ownership of decedent's personal residence valued at $105,000, and 100 percent ownership of all the outstanding shares of the George H. Moor, Inc., corporation. Following is a table of the stocks and bonds contained in the trust's securities portfolio on the date of decedent's death, including the valuation of each such security as of decedent's date of death, the details concerning disposition of such securities by the trustee in the six-month period following decedent's death, and the income record in 1976 of any securities which were retained: Securities Held by George H. Moor Trust Fair Market Value
Date of
as of 6/6/76
Disposal
1. $ 90,000 U.S.
(at face)
Treasury Bonds
$ 72,000.00
--application for
3.25% due 6/15/83
18,000.00
redemp. at par
(flower bonds)
* 1,390.57
made with Fed.
Estate Tax Return
2. $ 5,000 Ohio State Water
4,925.00
6/16/76
Develop. Authority Rev. Bond
* 75.53
5.7% due 9/1/84
3. $ 10,000 Columbus & So. Ohio
10,200.00
Elec. Co. 1st Mtg. Rev. Bond
* 12.64
9.25% due 6/1/82
4. $ 10,000 Industrial
Nucleonics Corp.
4,300.00
9/3/76
Subord. Conv. Deb.
* 7.51
7% due 6/1/91
5. $ 5,000 Nationwide Real Estate
2,550.00
9/3/76
Inv., Subord. Conv. Deb.
* 150.14
7% due 1/1/91
6. $ 3,000 Promissory Note of
3,000.00
pd. 11/1/76
Jack Witchey -- 8% due 11/1/76
* 23.61
7. $1,000 Demand Note of
1,000.00
11/24/76
Capital Finance Corp.
* .93
8. 580 10% pfd. shs.
58,000.00
Columbus & So. Ohio Elec. Co.
*458 Income Record
for
Net Amount
Assets kept
Realized
1976
1. $ 90,000 U.S. Treasury Bonds
3.25% due 6/15/83
(flower bonds)
2. $ 5,000 Ohio State Water Bond
$4,855.50
5.7% due 9/1/84
3. $ 10,000 Columbis & So. Ohio
$925.00
Elec. Co. 1st Mtg. Rev. Bond
9.25% due 6/1/82
4. $ 10,000 Industrial Nucleonics Corp.
Subord. Conv. Deb.
4,300.00
7% due 6/1/91
5. $ 5,000 Nationwide Real Estate
2,775.00
Inv., Subord. Conv. Deb.
7% due 1/1/91
6. $ 3,000 Promissory Note of
3,000.00
Jack Witchey - 8% due 11/1/76
with interest owed
7. $ 1,000 Demand Note of Capital
1,000.00
Finance Corp.
8. 580 10% pfd. shs.
5,800.00
5,800.00
Columbus & So. Ohio Elec. Co.
(10.00/sh)
(10.00/sh)
Income Record
for
Fair Market Value
Date of
Net Amount
Assets Kept
as of 6/6/76
Disposal
Realized
1976
9. 100 8.64%
pfd. shs.
$8,300.00
$864.00dLTranscontinental
Gas Pipe Line Corp.
(8.64/sh)
10. 1,000 pfd.
Series A conv. shs.,
2,687.50
9/ 3/76
$1,924.47
International
Industries, Inc.
11. 1,004 common shs.,
American Gen.
23,491.09
6/24/76
23,164.00
Bond Fund, Inc.
12. 200 common shs.
Amtel Inc.
1,156.25
7/ 8/76
1,091.52
* 16.00
13. 1,300 common shs.
Bancroft Conv.
20,068.75
6/24/76
20,016.85
Fund, Inc.
14. 100 common shs.
Beker Industries
900.00
7/ 8/76
841.47
Corp.
15. 2,000 common shs.
Buckeye Int'l, Inc.
20,375.00
9/ 3/76
15,250.00
16. 2,000 common shs.
Columbus & So.
44,187.50
7/13/76 ** 13,443.57
Ohio Elec. Co.
17. 222 common shs.
Iowa-Illinois Gas
4,044.56
381.84
& Elec. Co.
(1.72/sh)
18. 400 shs. Ben. Int. Nationwide
1,700.00
9/ 3/76
1,450.00
Real Estate Inv.
* 12.00
19. 400 common shs.
Penn. Power &
7,952.50
720.00
Light Co.
(1.80/sh)
*459 Income Record
for
Fair Market Value
Date of
Net Amount
Assets Kept
as of 6/6/76
Disposal
Realized *
1976
20. 200 common shs.
Phil. Elec. Co.
$3,125.00
$328.00 ** 82.00
(1.64/sh)
21. 100 common shs.
Pratt & Lambert Inc.
1,193.75
7/8/76
$1,124.52
22. 100 common shs.
Quaker State Oil
1,553.13
9/3/76
1,557.62
Refining Corp. ** 19.50
23. 200 common shs.
Southern Co.
2,831.25S
24. 800 common shs.
Toledo Edison Co.
18,300.00
1,696.00
(2.12/sh)
25. 200 common shs.
Transco, Inc.
2,562.50
7/8/76
2,670.45
26. 200 common shs.
United Aircraft
1,862.50
6/21/76
1,781.93
Prod. Co.
27. 100 common shs.
Varco Int'l Inc.
1,612.50
7/2/76
1,582.43
28. 300 common shs.
Zions Utah Bancorp.
6,750.00
9/3/76
6,375.00
29. 5 Municipal Bond
Fund Unit CTF Series 15
4,975.80
6/21/76
4,960.60 ** 33.15
30. 100 shs.
Castleton Industries,
196.88
10/25/76
159.43
Inc.
*460 Income Record
for
Fair Market Value
Date of
Net Amount
Assets Kept
as of 6/6/76
Disposal
Realized
1976
31. U.S. Series E.
Bonds
* $ 8,622.68
12/8/76
$8,889.30
Total Value of
Securities on
Date of Death
$349,046.57
Less Amt. Due BancOhio
70,521.64
Plus Principal Cash
60.86
Plus Income Cash
2,341.86
Plus Accrued Interest
1,301.94
Net Value of Securities
Portfolio On Date of
$282,229.59
Death
As of July 6, 1976, George Moor, Inc., had the following assets: Assets
Book Value
Cash
$ 2,629.50
Land
8,847.48
Building 1111
70,816.82
Building 1159
20,242.20
Stocks and Securities
51,811.97
Total
$154,347.97
The corporation for its taxable year 1976 reported $24,300 in gross rentals. Stocks and securities owned by the corporation consisted mostly of shares and debentures of the Columbus and Southern Ohio Electric Company on which interest and dividends were received in 1976. On the estate tax return, the estate had valued its shares in the corporation at $ 205,425, the value of the underlying *461 net assets of the corporation as of the June 6, 1976, date of death. Within six months of decedent's death, the trustee had sold 22 of the 31 different types of stocks and bonds which had been held at decedent's death. The stocks and bonds sold had a value as of the date of decedent's death of approximately $ 160,009. The securities which the trust continued to retain consisted of the $ 90,000 of "flower bonds" which the trustee retained in anticipation of being able to apply such bonds at par in payment of the Federal estate tax and shares of stock and debentures in various utility companies. In January 1977, the trustee also liquidated George Moor, Inc. The trust at such date thus directly held all of the assets of the corporation and beginning in 1977 received the rentals on the two buildings previously leased out by the corporation. One building produced $ 1,200 a month in rent and the other produced $ 900 a month in rent. The trust, on the Federal estate tax return filed, claimed a charitable deduction in the amount of $ 246,364.21. The amount of the deduction was computed as follows on the return: Item
Character of
No.
Name and Address of Beneficiary
Institution
Amount
1
Charitable Remainder Annuity Trusts
Created under Item IV of the Fourth
Superseding Trust Instrument of
George H. Moor, executed April 15, 1976.
Trust A for benefit of surviving spouse,
Elsie I. Moor.
Date of Birth: August 26, 1903
Charitable Deduction:
$105,906.39 * * *
Trust B-1 for benefit of George H. Moor, Jr.
Date of Birth: January 7, 1916
23,818.15 * * *
Trust B-2 for benefit of Elvin Moor
Date of Birth: June 4, 1918
21,531.02 * * *
Trust B-3 for benefit of Mary Elizabeth
Saunders
Date of Birth: January 7, 1915
4,668.35 * * *
2
Rest residue and remainder held in trust
for benefit of Capital University of
Bexley, Ohio
Educational
171,088.77
Total
$327,012.68
Less:
(a) Federal estate tax payable out of
above-listed property interests
$72,644.67
(b) Other death taxes payable out of
above-listed property interests
8,003.80
Total of items (a) and (b)
80,648.47
Net value of above-listed property interests * * *
$246,364.21
*462 Both Trust B-2 and Trust B-3 were funded on June 28, 1979, with a total of $ 88,000 of U.S. Treasury Bonds. Trust B-2 was funded with $ 70,000 of U.S. Treasury Bonds bearing interest at 8-3/4 percent, due November 15, 2008, but callable beginning in 2003, which had a purchase price of $ 69,825. Trust B-3 was funded with $ 18,000 of U.S. Treasury Bonds bearing interest at 8-3/4 percent due November 15, 2008, which were callable beginning in 2003 and had a purchase price of $ 17,955. Both Trust B-2 and Trust B-3 meet the requirements for charitable remainder annuity trusts contained in section 664. As of the June 6, 1976, date of decedent's death, Elvin Moor, who was to be the life annuitant of Trust B-2, was 58 years old. On June 6, 1976, Mary Elizabeth Saunders, who was to be the life annuitant of Trust B-3, was 61 years old. During the interim period from the date of decedent's death to the date upon which Trusts B-2 and B-3 were funded, the estate and the George Moor Trust had the following adjusted net income for the years indicated: Adjusted Net Income 6/6/76 -
6/1/77 -
6/1/78 -
5/31/77
5/31/78
5/31/79
A. Estate
Net Income as Reported on Fiduciary
$ 1,600.00 Income Tax Return (From 1041)
Adjustments
1) Charitable Deduction
$ 2,204.28 $ 40.79
7,306,19 2) Taxes Paid from Principal
56.80 3) Nontaxable Interest
1,178.62 4) Attorney Fee Paid from Principal
200.00 5) Capital Gain
(4,000.00)
6) Income in Respect of Decedent
(1,193.26)
(4,966.33)
Adjusted Net Income
$ 1,067.82 $ 40.79
$ 1,318.48 B. George Moor Trust
Net Income as Reported on Fiduciary
$ 17,319.90 $ 24,768.87
$ 14,401.06 Income Tax Return (Form 1041)
Adjustments
1) Charitable Deduction
37,450.65 9,123.95
30,380.08 2) Nontaxable Interest
137.45 3) Depreciation *
982.00 2,946.00
2,700.50 4) Nontaxable Cash Dividends
7,992.14 5) Interest Expense Paid from
Principal
1,112.03 6) Capital Gain
(30,609.14)
(24,701.56)
7) Income in Respect of Decedent
(6,681.33)
8) Fiduciary Fee Allocable to
Nontaxable Interest
(15.97)
9) Fiduciary Fee Allocable to
Nontaxable Cash Dividend
(743.19)
Adjusted Net Income
$ 19,695.59 $ 36,838.82
$ 30,029.03 *463 During this interim period, the trustee of the George H. Moor Trust distributed the trust's annual income to decedent's widow, the two sons, and the housekeeper. The total sums distributed to each in this period were approximately equal to the annuity that was to be paid to each. [2]
As of June 6, 1976, the date of decedent's death, the net amount of property in the trust and decedent's estate available to fund the trusts directed to be established in the trust instrument was approximately $ 523,587. This amount represented the value of the gross for Federal estate tax purposes less the bequests left to Mr. Moor's widow, administrative expenses and debts and the Federal estate and State death taxes that would be owed. [3]
*464 Respondent in his notice of deficiency determined a deficiency of $ 9,861.75 against the estate. The notice of deficiency contained the following explanatory statements: Returned
Determined
(a) Transfers during decedent's life
$ 592,654.59
$ 606,484.65
It is determined that the total value
of the transfers made during the
decedent's life was $ 606,484.65 instead
of the $ 592,654.59 shown on the
estate tax return. Therefore, the
taxable estate is increased $ 13,830.06,
computed as shown in Exhibit A * * *
(b) Schedule N - Charitable bequest Item (1) B-2
21,531.02
NONE
It is determined that the fair market
value of the remainder interest in the
trust created for the benefit of Elvin
Moor is not allowed for the estate tax
charitable deduction where the probability
that a charitable remainder interest will
be defeated is in excess of five percent.
Item (1) B-3
4,668.35
NONE
It is determined that the fair market
value of the remainder interest in the
trust created for the benefit of Mary
Elizabeth Saunders is not allowed for
the estate tax charitable deduction
where the probability that a charitable
remainder interest will be defeated is
in excess of five percent.
Item 2 - Net distributable residue
90,440.30
96,227.55
It is determined that the net distributable
residue of the charitable bequest
is $ 96,227.55 instead of the $ 90,440.30
claimed on the estate tax return. Therefore,
the charitable bequest is increased $ 5,787.25
Charitable Bequests Returned
$ 246,346.21
Charitable Bequests Determined
225,952.09
Adjustment
3a $ 20,412.12
*465 The estate in its petition agreed with the adjustments made to the value of the transfers decedent had made during his life except for the valuation of the flower bonds. The valuation of the bonds is in dispute because, if any further estate tax is determined to be owing, a further amount of the bonds would be applied at par in payment of such estate tax and would thus also have to be included at their par value in the gross estate. [4]
Section 2055(a) generally provides for a deduction from the value of the gross estate for the amount of all bequests, legacies, devises, or transfers made to qualified charities. However, under section 2055(e)(2)(A), *466 generally no deduction is allowed for a remainder left to charity unless the charity's interest is in a charitable remainder annuity trust or a charitable remainder unitrust or a pooled income fund. Sections 20.2055-2(a) and -2(b), Estate Tax Regs., contain further requirements for the allowance of a deduction for transfers made which are not exclusively for charitable purposes. [5]
*467 The sole issue herein involves the application of the provisions of section 20.2055-2(b), Estate Tax Regs., to the facts in this case. Petitioner's first contention is that section 20.2055-2(b), Estate Tax Regs., is not applicable at all under the very terms of the regulation itself. It is petitioner's contention that remainder interests are covered by section 20.2055-2(a), Estate tax Regs., and not by section 20.2055-2(b) of the same regulation. We do not agree with petitioner's reading of the regulations. Section 20.2055-2(b), Estate Tax Regs., applies where the gift to charity is subject either to a condition precedent or where the gift is vested, subject to defeat upon the occurrence of a subsequent event. Petitioner's reading of the regulation runs contrary to prior judicial interpretation. In order to be deductible, transfers to charities are required to meet the requirements of section 20.2055-2(b) as well as the requirement contained in section 20.2055-2(a), Estate Tax Regs. Estate of Gooel v. Commissioner,68 T.C. 504, 509 (1977), affd. without published opinion 639 F.2d 788 (9th Cir. 1981). While the gifts to charity here in issue *468 are not subject to a condition precedent, both gifts are subject to defeat upon the occurrence of a subsequent event. Pertinent is that portion of section 20.2055-2(b), Estate Tax Regs., which states: If an estate or interest has passed to, or is vested in, charity at the time of a decedent's death and the estate or interest would be defeated by the subsequent performance of some act or the happening of some event, the possibility of occurrence of which appeared at the time of the decedent's death to be so remote as to be negligible, the deduction is allowable. * * * Here, assuming the annual yield of the trusts to be 6 percent per year, corpus would have to be invaded to pay each life annuitant his annuity. As a result of such invasion, the corpus of Trusts B-2 and B-3 could be completely exhausted so that there would be nothing left for the charity to take if the life annuitant lives beyond a certain number of years. The life beneficiary of the trust living to such an age that the trust is totally exhausted in order to pay the annuity required under the trust instrument, is an event with which the regulation is concerned. The regulation provides that if the chance of the *469 occurrence of such event is determined to be so remote as to be considered negligible, a charitable deduction is allowable. The prior cases have accordingly interpreted section 20.2055-2(b), Estate Tax Regs., to be applicable in situations comparable to that here involved if, as respondent contends, the chance that the trust will be totally exhausted is not negligible. Estate of Gooel v. Commissioner,supra at 513-514; Estate of Moffett v. Commissioner,31 T.C. 541, 546-547 (1958); Florida National Bank of Jacksonville v. United States, an unreported case ( S.D.Fla. 1962, 10 AFTR 2d 6179, 62-2 USTC par. 12,082). But see Estate of Schildkraut v. Commissioner,368 F.2d 40 (2d Cir. 1966), reversing a Memorandum Opinion of this Court; however, see discussion of that case in Estate of Gooel v. Commissioner,supra at 514. Moreover, section 20.2055-2(e)(1), Estate Tax Regs., indicates such requirements must be met. [6]
*470 Petitioner's next contention is that section 2055 does not require the standard contained in section 20.2055-2(b), Estate Tax Regs., to be met in order for a charitable deduction to be allowed. The requirement imposed by the regulation is longstanding. See Commissioner v. Sternberger's Estate,348 U.S. 187, 193-194 (1955). However, petitioner contends that since section 2055, as amended by sec. 201(d)(1), Tax Reform Act of 1969, 83 Stat. 550, generally requires a remainder interest left to charity to either be in a pooled income fund, charitable remainder annuity trust, or charitable remainder unitrust, Congress intended the requirement contained in section 20.2055-2(b), Estate Tax Regs., to be dispensed with. Petitioner in urging this position states that the manner in which the charitable deduction is computed takes into account the fact that the remainder interest to charity will be diminished if the life annuitant on the date of decedent's death has a long-projected lifespan. Petitioner reasons that the younger the life annuitant is at the time of decedent's death, the greater his reasonable life expectancy and therefore the present value of his life interest *471 will accordingly be larger. Since the amount of the deduction that is to be allowed is computed by subtracting the present value of the life annuitant's interest from the total value of the trust corpus, the greater the life expectancy of the life annuitant, the smaller the deduction for the remainder interest transferred to the charity. See section 20.2055-2(f)(1) and -2(f)(2)(i), Estate Tax. Regs., and section 1.664-2(c), Income Tax Regs. As further support for its position, petitioner cites the example contained in the legislative history which computes a charitable deduction for the remainder interest in a charitable remainder annuity trust where as assumption is made that the trust will earn a 3-1/2 percent return on its corpus. H. Rept. No. 91-413 (1969), 1969-3 C.B. 200, 238. [7] Since section 664(d)(1)(A) requires that a charitable remainder annuity trust distribute a yearly annuity whose amount is not less than 5 percent of the initial net fair market value of all property placed in the trust, it is apparent that there would be an invesion into trust corpus since the trust in the legislative history is assumed to earn only a 3-1/2 percent return on the trust property. *472 Petitioner further calculates that if the life annuitant of the trust in the example was a male, age 55 or less, the trust would fail to meet the requirement of section 20.2055-2(b), Estate Tax Regs., since respondent takes the position that a chance of more than 5 percent that the charity will not take is not sufficiently remote to be considered negligible. [8]
In essence, petitioner's position is that if a value for the remainder to charity can be actuarially *473 computed, a deduction should be allowed. But if such were the case, an estate would be allowed a charitable deduction even where it was likely that the interest of the charity could be defeated. For instance, assume the facts of the present case except that life annuitant of Trust B-2 instead of being 58 years old is only 40. [9]The charity's interest in our hypothetical can clearly be ascertained and valued. However, there is a 54.2 percent chance, calculated using United States Life Table 1959-1961 (see table LN, section 20.2031-10(e), Estate Tax Regs.) and a 6 percent interest on the corpus, that the life annuitant will live long enough so that the trust will be entirely exhausted in order to pay his yearly annuity. Such a gift to charity is hardly assured. The legislative history contains no indication that Congress in such a circumstance intended a deduction to be allowed. [10] We do not agree that a charitable deduction should be allowed merely because the interest of the charity can be actuarially valued. The same argument petitioner now makes has been raised in the past but has been rejected. Commissioner v. Sternberger's Estate,supra;United *474 States v. Dean,224 F.2d 26, 28-29 (1st Cir. 1955). Further, Treasury regulations are entitled to great weight and will only be overturned if plainly inconsistent with the statute. Commissioner v. South Texas Lumber Co.,333 U.S. 496, 500 (1948). Petitioner's last contention is that section 20.2055-2(b), Estate Tax Regs., is in any event satisfied since the chances of the charities not taking with respect to either Trust B-2 *475 or B-3 is so remote as to be considered negligible. This determination is factual. Jones v. United States,395 F.2d 938, 942 (6th Cir. 1968); Estate of Gooel v. Commissioner,supra at 509. The phrase "so remote as to be negligible" has been defined as a chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction.It has also been defined as a chance which every dictate of reason would justify an intelligent person in disregarding as so highly improbable and remote as to be lacking in reason and substance. Briggs v. Commissioner,72 T.C. 646, 656-657 (1979). Respondent's position is that a more than 5 percent chance that the charities' interests will be defeated is not so remote as to be considered negligible. The parties have stipulated that assuming a 6 percent annual return on each trust corpus, the chance that the corpus will be totally exhausted in payment of the annuity to the life annuitant is actuarially 7.63 percent for Trust B-2 and 7.09 percent for Trust B-3. [11] The parties have also stipulated to a computation *476 which assumes an annual yield of 6.2 percent on the trust assets. At such an annual yield, both trusts would be exhausted at the end of 33 years. The chances of the annuitant of Trust B-2 or B-3 living that length of time as calculated under the actuarial statistics contained in table LN are, respectively, 4.59 percent and 3.75 percent. *477 Petitioner here asserts that we should relate the funding of Trusts B-2 and B-3 with 8-3/4 percent Treasury bonds on June 28, 1979, back to the June 6, 1976, date of decedent's death. Obviously, then, the income produced will exceed the amount of the annuity that must be paid so that there will be no invasion. However, under the terms of the regulation, the determination of whether the chance that the charity will not take is remote is to be made at the date of death. Thus, subsequent events are irrelevant except insofar as they cast light on the facts and circumstances which were in existence or to be anticipated as of the date of death. See Underwood v. United States,407 F.2d 608, 610 (6th Cir. 1969). The record shows, however, that the net income of both the trust and the estate during the interim period between decedent's date of death and the funding of Trusts B-2 and B-3 represented an annualized yield of about 6.4 percent on the net value of the assets available for funding all the trusts decedent directed to be established. [12] To be sure, this computed yield was only for the interim period and it is not certain that such yield would continue into the *478 foreseeable future for the entire existence of Trusts B-2 and B-3. However, most of the assets in decedent's estate were readily convertible to cash and this type of asset was sufficient to fund nearly all of the four trusts. Considering the nature of the assets in the estate, possibly of more significance is the fact, of which we take judicial notice under Rule 201 of the Federal Rules of Evidence, that long-term Treasury bonds in 1976 had an average annual yield of 6.78 percent and that FHA insured mortgages on the secondary market in 1976 had an average yield of 8.82 percent. U.S. Dept. of Commerce, Statistical Abstract of the United States (1980), p. 545. These yields are higher than the 6 percent annual rate of return presumed under the tables found in the Treasury regulations. However, it has been observed that the rate of return contained in the tables in the regulations is not set in concrete. Estate of Gooel v. Commissioner,supra at 511. The tables contained in the regulations are merely evidentiary. In a similar context, the Supreme Court in Simpson v. United States,252 U.S. 547 (1920), sanctioned *479 the use of the tables found in a Treasury regulation by stating that it would take judicial notice of the fact that at the time the tax was collected, a rate of return of 4 percent was very generally assumed to be the fair value or earning power of money safely invested. In this case, as we have pointed out, a fair return on money safely invested in long-term Treasury bonds or FHA insured mortgages was well in excess of 6 percent at the time of Mr. Moor's death. *480 Respondent argues that some of the investments held by the trust at the date of decedent's death produced less than 6 percent return. However, the record shows that most of these securities produced well over 6 percent, many producing over 10 percent. The income produced by the investments in the trust at the date of decedent's death has less significance than it would have if many of them had not been sold within six months after Mr. Moor died. However, it is clear from the record that the average income from the investments at the date of Mr. Moor's death was well over 6.2 percent. In Estate of Gooel v. Commissioner,supra, we stressed the fact that it had not been shown that the assets in the estate produced a rate of return in excess of the amounts provided for in respondent's regulations, or with which of these assets the trusts were to be funded. Here, the record shows that many of the assets in the estate were producing a return well in excess of 6 percent. It also shows that many of these assets were sold and the trusts were funded with long-term Government bonds producing an 8-3/4 percent return. Although this funding did not occur until 3 years *481 after Mr. Moor's death, it is a clear indication of the intent of the trustee. As is apparent, because of this action by the trustee, there will in fact be no invasion of the trust corpus but, rather, additions thereto until at least the year 2003. Respondent contends, however, that even the long-term Treasury bonds which were purchased do not absolutely guarantee a yield of more than 6.2 percent over the entire period in which Trusts B-2 and B-3 may be in existence since the bonds are callable in the year 2003. In our view, it is not required that the differing yield be shown to be an absolute certainty over the entire duration of the trusts. Treasury bonds are a very secure investment and the 29 years to redemption in the year 2008, or the 25 years until the bonds are callable, is a sufficiently long period of time covering all of the probable duration of the trusts based on the life expectancy of the beneficiaries. Even if the life of each trust extends beyond the year 2008 or if the bonds are called earlier, the trustee will receive the full redemption amount which he can again invest. See Estate of Christ v. Commissioner,480 F.2d 171, 173 (9th Cir. 1973), *482 affg. 54 T.C. 493 (1970). Considering the assets contained in the George H. Moor Trust and in decedent's estate as of the date of death, it appears likely that as of June 6, 1976, a net income representing a rate of return of at least 6.2 percent might be anticipated over a long period. It is obvious that the flower bonds would be used to pay the Federal estate tax due. As to the personal residence, decedent's wife had an option to take a life estate in that half of the property upon which the house was located. The stocks and bonds contained in the trust's securities portfolio were of a liquid nature, as evidenced by the fact that a major portion of the portfolio was sold by the trustee within six months after the date of death. The securities owned by George H. Moor, Inc., were also liquid. The rental real property held by the George H. Moor Corporation produced an annual rental income representing a return on the property well in excess of 6.2 percent. Although the assets of George H. Moor, Inc., were not directly held by the trust, there was no obstacle to the trust's liquidating the corporation and receiving its assets since the trust owned 100 percent of *483 all the outstanding stock of the corporation. The pertinent question, however, is what yield could be expected of Trusts B-2 and B-3. Trusts B-2 and B-3 were not in existence as of the date of death. The trustee of the George H. Moor Trust was directed to establish such trusts, yet as a practical matter it would obviously take a period of time before these trusts and the other trusts which decedent directed be established could be funded. Nevertheless, the determination of whether petitioner is entitled to charitable deductions for the charitable remainder interests in Trusts B-2 and B-3 requires us to view the situation as if these trusts were established and funded on the date of death. On this date there was more than sufficient property in the estate and trust available for the trustee to utilize to not only establish but fully fund Trusts B-2 and B-3 as well as the other trusts provided for under Mr. Moor's will. The question is then what property would the trustee have placed in Trusts B-2 and B-3 on the date of death. Since the trustee not only had to establish Trusts B-2 and B-3 but also trusts for decedent's wife and other son, it is difficult to say exactly what property *484 would be used to fund such trusts. Most likely, unless he wished to place the rental property held by George H. Moor, Inc., into Trust A which was to have a trust corpus of $ 215,000, the trustee would have to sell these rental properties. The net sales proceeds could then be directly placed into the trusts to be established or could be used to purchase assets to be placed into those trusts. Since the trustee is also not only responsible for the establishment and funding of these trusts but also for their management, it would obviously be desirable from his viewpoint that passive but secure investments producing an amount of income sufficient to pay each annuity amount called for be made. The trust instrument, which we have quoted in our findings, states that the trustee is not to be restricted from investing the trust assets in a manner which could result in the annual realization of a reasonable amount of income. Since the trustee owes a fiduciary responsibility to deal fairly with both the life annuitant and the charitable remainder, he would be obliged to make prudent investments which would produce sufficient income so that no invasion of corpus would unnecessarily be made. *485 Considering the average yields on long-term U.S. Treasury bonds and FHA mortgages in 1976, it is apparent that such investments were available as of the time of decedent's death. In 1979, the trustee did make such an investment by purchasing $ 88,000 of U.S. Treasury bonds paying interest of 8-3/4 percent to fund Trusts B-2 and B-3. However, it has been said that before the rate contained in the Treasury Regulations will be disregarded, a taxpayer must show that the application of such a rate is unreasonable or inappropriate. Estate of Alexander v. Commissioner,25 T.C. 600, 614 (1955). Further, there arises a question of relevancy, or at least a further element of uncertainty is introduced, where the higher rate of return urged is based on the yield on assets not actually held by the trust. Estate of Gooel v. Commissioner,supra at 511. However, on this record we conclude that a yield of at least 6.2 percent could be reasonably anticipated as of the date of death. But the specific question we are confronted with is whether on the facts presented the chance of charity not taking as to each of the respective remainder interests in Trusts *486 B-2 and B-3 is so remote as to be negligible. Even using the 6 percent rate of return urged by respondent, the percentages of such an occurrence are actuarially computed to be, respectively, 7.63 percent and 7.09 percent. Using a higher rate of return of 6.2 percent, it is conceded by respondent that the percentage chances computed would be negligible, being 4.59 percent and 3.75 percent, respectively. Considering all the facts present in this case, there is doubt as to whether even the 7.63 and 7.09 percent possibilities should not be considered to be negligible. We have found no case holding percentages this low not to be negligible. But see United States v. Dean,supra (1 out of 11 or 9.1 percent chance not considered negligible). However, weighing these percentage figures together with the other facts of record indicating the likelihood of a return on the corpus of each trust in excess of 6.2 percent, we conclude that the chances of the charities not taking in the case of each trust is negligible. Accordingly, charitable deductions are allowable for the transfers of the remainder interests in Trusts B-2 and B-3 to charity. We decide the only issue presented to us *487 for petitioner. However, because of adjustments agreed to by petitioner, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. The original instrument creating the trust was dated July 28, 1965. However, a number of other superseding instruments were subsequently executed. The last such instrument which was in effect as of decedent's date of death was executed on April 15, 1976.↩
*. Accrued income as of June 6, 1976.↩
*. Accrued income as of June 6, 1976. ** 600 of the 2,000 shares disposed of.↩
*. On many of these securities the trust received interest or dividend income between the date of Mr. Moor's death and the date of disposition of the asset. ** Accrued income as of June 6, 1976.↩
*. $ 3,656.25 original cost; $ 4,966.43 interest owed as of date of death.↩
*. Respondent disputes that an adjustment to net income should be made for depreciation.↩
2. Decedent's widow had not elected to reside in the Westwood residence. The residence was then subsequently sold by the trustee.↩
3. As hereinafter discussed, minor adjustments were made by respondent in the gross estate with respect to the value of certain securities, to which adjustments petitioner has agreed. The $ 523,587 net amount of the property was arrived at by using the gross estate as adjusted. However, the amounts of the Federal estate and State death taxes will also be somewhat higher because of these adjustments; hence, the actual net amount of the net property available is somewhat lower than the $ 527,270.36 figure petitioner computed on brief.↩
3a. The correct amount of such asserted adjustment for charitable bequests is $ 20,412.12 ($ 21,531.02 plus $ 4,668.35 minus $ 5,787.25); the amount stated as the value of the charitable bequests returned is incorrect.↩
4. See Bankers Trust Co. v. United States,284 F.2d 537 (2d Cir. 1960); Estate of Fried v. Commissioner,54 T.C. 805, 826 (1970). However, such an adjustment, if necessary, is only a computational matter which can be resolved under Rule 155, Tax Court Rules of Practice and Procedure.↩
5. Sec. 20.2055-2, Estate Tax Regs., states in part as follows: Sec. 20-2055-2 Transfers not exclusively for charitable purposes-- (a) Remainders and similar interests. If a trust is created or property is transferred for both a charitable and a private purpose, deduction may be taken of the value of the charitable beneficial interest only insofar as that interest is presently ascertainable, and hence severable from the noncharitable interest. Thus, in the case of decedents dying before January 1, 1970, if money or property is placed in trust to pay the income to an individual during his life, or for a term of years, and then to pay the principal to a charitable organization, the present value of the remainder is deductible. See paragraph (e) of this section for limitations applicable to decedents dying after December 31, 1969. See paragraph (f) of this section for rules relating to valuation of partial interests in property passing for charitable purposes. (b) Transfers subject to a condition or a power. (1) If, as of the date of a decedent's death, a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible. If an estate or interest has passed to, or is vested in, charity at the time of a decedent's death and the estate or interest would be defeated by the subsequent performance of some act or the happening of some event, the possibility of occurrence of which appeared at the time of the decedent's death to be so remote as to be negligible, the deduction is allowable. If the legatee, devisee, donee, or trustee is empowered to divert the property or fund, in whole or in part, to a use or purpose which would have rendered it, to the extent that it is subject to such power, not deductible had it been directly so bequeathed, devised, or given by the decedent, the deduction will be limited to that portion, if any, of the property or fund which is exempt from an exercise of the power.↩
6. This portion of the regulations, which is expressly concerned with the limitations applicable to decedent's dying after December 31, 1969, states in pertinent part: If, however, as of the date of a decedent's death, a transfer for a private purpose is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, an interest in property will be considered to pass for a private purpose unless the possibility of occurrence of such act or event is so remote as to be negligible. * * *↩
7. The example contained in the legislative history states as follows: The application of this rule may be illustrated by the following example: assume a donor made a completed gift of $ 100,000 to a trust which provides for a $ 5,000 annuity to A for life and the remainder to charity. With a 3-1/2-percent discount rate, the present value of the income interest would be valued by determining A's life expectancy and discounting the annual $ 5,000 payments by 3-1/2 percent. This amount, when subtracted from the total value of property transferred, would indicate the present value of the charitable remainder. * * * ↩
8. Respondent's position in this regard is set forth in Rev. Rul. 77-374, 1977-2 C.B. 330↩.
9. The parties have stipulated that, assuming an annual rate of return on the trust property of 6 percent, the trust corpus will be completely exhausted at the end of 31 years through invasion in order to pay the 7 percent yearly annuity. ↩
10. Moreover, this high chance of the charity not taking may not only result solely from the circumstance of the life annuitant being a certain age on the date of death. Conceivably, the trust instrument itself may provide for payment of a yearly amount that is so greatly in excess of annual income that the chance of exhaustion of the trust corpus is greatly increased. Sec. 664(d)(1)(A) only requires that an amount not less than 5 percent of the initial trust corpus be paid yearly.↩
11. These percentages were arrived at by computing that a trust with an annual yield of 6 percent would be completely exhausted at the end of 31 years as a result of paying out in monthly installments a yearly annuity of an amount equal to 7 percent of the initial value of the trust corpus to the life annuitant. Utilizing table LN of sec. 20.2031-10(e), Estate Tax Regs., the actuarial chance that the respective life annuitants of Trusts B-2 and Trust B-3 will live 31 years can be computed. For example, based on actuarial statistics, it is estimated that out of every 100,000 males born, 77,032 of such males will live to age 58. Of those 77,032 males who reach age 58, only 5,875.8 will live 31 years to age 89. Thus, the chance of the life annuitant of Trust B-2 living 31 years according to the actuarial tables is 7.63 percent (5,875.8 divided by 77,032).↩
12. We agree with petitioner that an adjustment to taxable income should be made with respect to depreciation in determining actual net income. The allowance for depreciation permitted for income tax purposes represents only a historical spreading of cost and not necessarily any actual physical depreciation in value of the property.Because of this, depreciation has in the past been disregarded in determining the value of charitable remainder interests where the trusts contained depreciable property. National Bank of Commerce in Memphis v. United States,422 F.2d 1074, 1077 (6th Cir. 1970); Edgar v. Commissioner,56 T.C. 717, 752-753 (1971). However, where there is a charitable remainder interest in real property, as opposed to a trust, the legislative history to the Tax Reform Act of 1969, 83 Stat. 550, indicates depreciation is to be taken into account in valuing the remainder interest. S. Rept. No. 91-552 (1969), 1969-3 C.B. 423↩, 480. See also sec. 170(f)(4), which is concerned with valuation of remainder interests in real property with respect to a charitable deduction for income tax purposes.